Filed 9/18/13 (unmodified version attached)

## CERTIFIED FOR PARTIAL PUBLICATION\*

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Butte)

----

| | |
|---|---|
| FRIENDS OF OROVILLE et al., | C070448 |
| Plaintiffs and Appellants, | (Super. Ct. No. 152682) |
| v. | |
| CITY OF OROVILLE et al., | ORDER MODIFYING AND CERTIFYING OPINION FOR ADDITIONAL PARTIAL PUBLICATION |
| Defendants and Respondents; | |
| WAL-MART STORES, INC., | [NO CHANGE IN JUDGMENT] |
| Real Party in Interest and Respondent. | |

THE COURT:\*\*

It is ordered that the opinion certified for partial publication, filed herein on August 19, 2013, be modified to also include publication of parts II.A. and II.C. of the Discussion.

1.     The asterisked footnote at page 1 of the opinion is modified to include parts "II.A." and "II.C." of the Discussion and will now read as follows:

> \*  Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, only the introduction, the Factual and Procedural Background, the Standard of Review at the beginning of the Discussion, parts II.A., II.C., and III.A. of

---

\*\* Butz, Acting P. J., Mauro, J., and Murray, J.

1

the Discussion, and the Disposition of this opinion are certified for publication.

2. Previously unpublished parts II.A. and II.C. remain unchanged from the opinion filed on August 19, 2013, and read as follows:

## II. Analysis of Hydrological Impacts*

Plaintiffs raise four contentions on this subject.

### A. Baseline Description of Hydrological Conditions

Plaintiffs have two concerns here.

The first concern is with "Mitigation Measure HYD-4" (MM HYD-4), which specifies that, prior to issuance of grading permits for the Project, Wal-Mart shall retain a qualified civil engineer to prepare and submit a drainage plan for City's approval that identifies onsite drainage facilities to ensure that runoff from the Project site is released at a rate no greater than that of the "pre-development condition."

Plaintiffs claim the EIR fails to analyze existing water percolation rates through the highly permeable mining tailings on the Project site and, without that information, it cannot be determined whether there is a feasible drainage solution that will ensure the runoff rate is no greater than pre-development conditions, as MM HYD-4 requires.

The EIR, however, included a geotechnical investigation. This investigation analyzed the surface and subsurface composition of the Project site, including the mining tailings thereon, and performed three distinct tests of how those conditions currently affect water percolation. Furthermore, baseline information about the percolation rates of the mining tailings on the Project site will be part of a required study for the MM HYD-4 drainage plan. Finally, the MM HYD-4 standard of no greater runoff rate is designed to

_____

* See footnote, *ante*, page 1.

2

avoid a project-related increase in flooding of adjacent properties during storm events, a standard ascertainable from pre-development flood information.

Plaintiffs' second concern centers on "Mitigation Measure HYD-2a" (MM HYD-2a). That mitigation measure specifies that prior to issuance of building permits for the Project, Wal-Mart shall submit a stormwater management plan for the City's approval that identifies pollution prevention measures to prevent polluted runoff from leaving the Project site, that accounts for the Project's net increase of nearly 21 acres of impervious surface area, and that ensures that water quality in downstream water bodies is not degraded. MM HYD-2a specifies 11 pollution prevention measures that this plan must include, but is not limited to; in a response to comments on stormwater quality, the EIR notes that these prevention measures have been "widely employed and . . . demonstrated to be effective means at controlling and preventing pollution from entering downstream waterways."

Plaintiffs claim the EIR fails to include information about the baseline water quality conditions at the Project site and the receiving water body, the nearby Feather River.

As for existing water quality, the EIR states, however, that "[t]here are no water bodies in [the City] area listed on the 2006 [federal] Clean Water Act['s] . . . list of impaired water bodies. As such, no [pollution-remedial] Total Maximum Daily Load requirements are in effect for any surface water bodies in the Oroville area." Furthermore, as with percolation rates, existing runoff from the Project site will be part of the study for the MM HYD-4 drainage plan.

We conclude that the EIR's description of the challenged baseline hydrological information is adequate.

* * * * * [pt. II.B. not published]

3

## C. *Deferral of Mitigation*

Plaintiffs contend that MM HYD-2a (i.e., the stormwater management/pollution runoff plan) and MM HYD-4 (i.e., the drainage plan) improperly defer formulation of specific mitigation strategies until after the Project's approval. We disagree.

Deferral of mitigation specifics is permissible where the relevant agency commits itself to mitigation and articulates specific performance criteria or standards that must be met for the project to proceed. (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 793-794; *Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1275-1276.) The two challenged mitigation measures comply with this principle.

MM HYD-2a states that prior to the issuance of building permits Wal-Mart must submit for the City's approval a stormwater management plan that contains, but is not limited to, 11 specified pollution prevention measures to prevent polluted runoff from leaving the Project's site. These specified measures, the EIR notes, have been "widely employed and . . . demonstrated to be effective means at controlling and preventing pollution from entering downstream waterways," and implement "Best Management Practices" in controlling stormwater runoff quality.

MM HYD-4 provides that prior to the issuance of grading permits Wal-Mart shall retain a qualified civil engineer to prepare and submit for the City's approval a drainage plan "that will ensure that runoff from the [P]roject site is released at a rate no greater than that of the pre-development condition." This standard seeks to avoid any project-related increase in flooding of adjacent properties during storm events, a standard, as noted, ascertainable from pre-development flood information.

* * * * * [pt. II.D. not published]

4

There is no change in judgment.

The opinion in the above entitled matter, filed on August 19, 2013, was certified for partial publication of part III.A.  For good cause, it now appears that parts II.A. and II.C. of the Discussion should also be certified for publication in the Official Reports, and it is so ordered.  (***CERTIFIED FOR ADDITIONAL PARTIAL PUBLICATION.***)

**<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>**<sup>*</sup>


# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# THIRD APPELLATE DISTRICT

## (Butte)

----

| | |
|---|---|
| FRIENDS OF OROVILLE et al., | C070448 |
| Plaintiffs and Appellants, | (Super. Ct. No. 152682) |
| v. | |
| CITY OF OROVILLE et al., | |
| Defendants and Respondents; | |
| WAL-MART STORES, INC., | |
| Real Party in Interest and Respondent. | |

APPEAL from a judgment of the Superior Court of Butte County, Stephen E. Benson, Judge. Reversed in part and affirmed in part.

William D. Kopper for Plaintiffs and Appellants.

Cota Cole, Derek P. Cole, Scott E. Huber and Daniel S. Roberts for Defendants and Respondents.

K&L Gates and Edward P. Sangster for Real Party in Interest and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, only the introduction, the Factual and Procedural Background, the Standard of Review at the beginning of the Discussion, part III.A. of the Discussion, and the Disposition of this opinion are certified for publication.

In this action under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.),[1] the Friends of Oroville and two individuals (collectively plaintiffs) challenge the City of Oroville's (the City) approval of an environmental impact report (EIR) for the project at issue—a relocated and expanded Wal-Mart Supercenter to replace an existing Wal-Mart of traditional dimension and retail offerings (the Project).

On appeal, plaintiffs contend the City's EIR (1) improperly found it was infeasible for the Project to contribute its fair share mitigation for "Year 2030" cumulative traffic impacts along eight intersections of Oroville Dam Boulevard (hereafter Oroville Dam Blvd.), (2) inadequately analyzed the Project's hydrological impacts, (3) inadequately analyzed the Project's greenhouse gas emissions, and (4) violated CEQA's notice requirements. We find merit in plaintiffs' third contention (in published pt. III.A. of this opinion), agree on a tangential point with their first contention, and reverse on those bases, but otherwise shall affirm the judgment denying plaintiffs' petition for writ of mandate.

## FACTUAL AND PROCEDURAL BACKGROUND

The Project is a Wal-Mart Supercenter to replace an existing Wal-Mart store in the City. The Project comprises a nearly 200,000-square-foot building and garden center (about twice the size of the existing Wal-Mart store), and will provide 24-hour retail and grocery services to the City and surrounding areas.

In January 2010, prior to the City's release of the draft environmental impact report (DEIR), the City adopted resolution No. 7471. This resolution interpreted the City's general plan to allow roadway *segments*, rather than *intersections*, to determine the acceptable level of service for traffic along Oroville Dam Blvd.

---

[1] Undesignated statutory references are to the Public Resources Code.

Plaintiffs earlier filed an action for writ of mandate challenging resolution No. 7471. In response, the City repealed the resolution; and this necessitated a revision of the DEIR's traffic section, which was undertaken in a partially recirculated draft environmental impact report (PRDEIR).

In October 2010, the City released the final EIR, which included responses to public and agency comment.

On November 10, 2010, the City's Planning Commission held a public hearing and approved the EIR and the Project.

Plaintiffs appealed the Planning Commission's decision resulting in a de novo public hearing before the City's City Council. This hearing took place on December 2, 2010, and was extended to December 14. On December 14, 2010, the City Council approved the Project by denying plaintiffs' appeal, certifying the EIR, approving a mitigation program, and adopting findings of fact and a statement of overriding considerations (for significant impacts that could not be mitigated or mitigated fully).

We will set forth specific facts pertinent to the issues on appeal when we discuss those issues.

## DISCUSSION

### *Standard of Review*

"In reviewing . . . CEQA issues on appeal, we determine, independently from the trial court, whether [the] City prejudicially abused its discretion either by failing to comply with legal procedures or by making a decision unsupported by substantial evidence." (*Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1178 (*Anderson*).)

The substantial evidence standard—i.e., enough relevant information and reasonable inferences to support a fair argument-based conclusion, even if other

conclusions might also be reached—is applied in reviewing factually based findings, conclusions and determinations. (*Anderson*, *supra*, 130 Cal.App.4th at p. 1178; Cal. Code Regs., tit. 14, § 15384, subd. (a) (CEQA's regulatory guidelines; hereafter CEQA Guidelines).)

In reviewing the adequacy of an EIR's environmental analyses, a reviewing court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency in providing informed decisionmaking and informed public participation, thereby meeting the statutory goals of the EIR process. (*Anderson*, *supra*, 130 Cal.App.4th at p. 1178 .)

## I. The Traffic Issues[*]

### *Background and Contentions*

Traffic impacts pose a major issue for the Project. And Oroville Dam Blvd. (which is also State Route 162 in the City) comprises a large part of that issue.

Plaintiffs contend the City failed to adopt feasible mitigation for the Project's contribution to Year 2030 cumulative traffic impacts to eight intersections on Oroville Dam Blvd. because (1) the law and (2) substantial evidence, do not support the City's finding that fair share fee-based mitigation is infeasible to reduce the Project's impact to less than significant. We agree in a peripheral way with the first point and disagree as to the second.

The revised traffic section in the PRDEIR concluded, among other things, that these eight intersections along Oroville Dam Blvd. would operate at unacceptable levels of service in 2030 due to cumulative traffic impacts. The PRDEIR's traffic analysis estimated the Project's percentage contribution to these Year 2030 impacts at 5 and 6 percent for seven of the intersections, and 11 percent for the remaining intersection.

---

[*] See footnote, *ante*, page 1.

In mitigating these Year 2030 cumulative traffic impacts, the City imposed "Mitigation Measure TRANS-2a" (MM TRANS-2a) on the Project, which requires that: "Prior to issuance of building permits, [Wal-Mart] shall pay all transportation-related fees to [the City] in accordance with [the City's] latest adopted fee schedule."

The City explained MM TRANS-2a, as applied to the eight Oroville Dam Blvd. intersections at issue, as follows: "[MM TRANS-2a] requires [Wal-Mart] to pay all transportation-related fees, which constitutes the Project's fair share [toward mitigating the Year 2030 cumulative traffic impacts]. However, at the time of the [PRDEIR], the necessary improvements [on Oroville Dam Blvd.] were not identified in the City's Traffic Capital Improvement Program [(Traffic Program)]. As such, there is no existing mechanism in place for [Wal-Mart] to contribute its fair share, . . . render[ing] [these improvements infeasible] and the residual significance of this impact significant and unavoidable." "[MM TRANS-2a] requires [Wal-Mart] to provide fair share [mitigation] fees for improvements to these intersections [on Oroville Dam Blvd.] that would improve [Year 2030] operations to acceptable levels. It is only because there is uncertainty about whether all of these improvements can be implemented [per the Traffic Program, which is currently being updated,] that [MM TRANS-2a] cannot be deemed to fully mitigate the impact to a level of [less than] significant." (Furthermore, the PRDEIR noted, and the City recognized, that several of the Oroville Dam Blvd. improvements require widening the roadway to three lanes in each direction, which is, additionally, not a feasible improvement.)

The record shows that, when the City approved the EIR and the Project on December 14, 2010, the Traffic Program update was expected to be completed by March 2011, and the transportation-related fee schedule was being updated along with the Traffic Program update.

5

The City responded to a concern in the final EIR about MM TRANS-2a's implementation as follows: "If the Project's building permits are issued prior to the City updating its fee program per the update it is currently undertaking of the [Traffic Program], the Project would still pay fees . . . .  Some of the improvements required as a result of cumulative impacts are not included in the current [Traffic Program], however, and therefore no money would be collected towards those improvements.  [¶] . . . [¶] . . . [T]he City anticipates adopting the updated [Traffic Program] well before the Project could obtain its building permits.  Therefore, it is reasonable to assume that the Project will pay fees towards the improvements identified in the EIR as currently being considered for inclusion in the [Traffic Program]."

1. Legal infeasibility.

"A public agency must mitigate or avoid the significant environmental effects of a project that it carries out or approves if it is feasible to do so." (*Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 937 (*Tracy First*).)  "CEQA requires that feasible mitigation measures actually be implemented as a condition of development, and not merely be adopted and then neglected or disregarded." (*Anderson*, *supra*, 130 Cal.App.4th at pp. 1186-1187.)

A fair share fee contribution by a single project to a mitigation fund addressing cumulative impacts from multiple projects (which include the single project) constitutes mitigation of the single project's impact to less than significant if the fair share fee is (1) at least "roughly proportional" to the effects of the single project, and (2) part of a reasonable, enforceable plan or program that is sufficiently tied to the actual mitigation of the cumulative impacts at issue. (*City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 361-362 (*City of Marina*); *Anderson, supra,* 130 Cal.App.4th at pp. 1187-1189; *Tracy First*, *supra*, 177 Cal.App.4th at p. 937.)

6

Here, the City could not legally conclude that MM TRANS-2a would actually mitigate the Project's contribution to Year 2030 cumulative traffic impacts (for the eight intersections of Oroville Dam Blvd. at issue) to less than significant based on a fair share mitigation fee. This is because, at the time the City approved the EIR and the Project, the City's updated Traffic Program specifying future traffic improvements had not yet been completed and adopted.

Instead, under MM TRANS-2a, the City required Wal-Mart, prior to the issuance of building permits, to "pay all transportation-related fees to [the City] in accordance with the latest adopted fee schedule." This fee schedule was being updated along with the Traffic Program update. In recognition of this, the PRDEIR stated that if improvements to the eight intersections of Oroville Dam Blvd. at issue "are included in the [Traffic Program], payment of fees in accordance with [MM TRANS-2a] would satisfy [Wal-Mart's fair share] obligation."

Thus, the City, as a matter of determining the legal feasibility of mitigation measures for the eight Oroville Dam Blvd. intersections at issue, did what it could in approving the EIR and the Project in the absence of an enforceable mitigation plan or program at that point. In this absence, however, the City, in MM TRANS-2a, properly conditioned the issuance of building permits to Wal-Mart on Wal-Mart's payment of all transportation-related fees to the City in accordance with the latest adopted fee schedule. As this court observed in *Tracy First*, "[m]itigation measures adopted by [an] agency must be fully enforceable. 'A public agency shall provide that measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions, agreements, or other measures. . . .' ([§ 21081.6, subd. (b); CEQA Guidelines, § 15126.4, subd. (a)(2)].)" (*Tracy First*, *supra*, 177 Cal.App.4th at p. 937.)

However, in Wal-Mart's respondent's brief on appeal (a brief the City joins in full), Wal-Mart problematically interprets MM TRANS-2a as providing that "*if* the City

7

amends it[s] [Traffic Program] *before* the City issues building permits to Wal-Mart, Wal-Mart will have to pay its share of improvements included in that program." (Italics added.) One corollary to this interpretation is that *if* the City does *not* so amend, Wal-Mart will *not* have to pay its share of improvements in the Traffic Program. Given that the transportation-related fee schedule is being updated along with the Traffic Program update, we think it necessary to confirm that the issuance of building permits is a provision which *ensures* that Wal-Mart, as required by MM TRANS-2a, pays "all transportation-related fees to [the City] in accordance with the latest adopted fee schedule," and not a provision that *excuses* such payment depending on when building permits are issued. In short, the issuance of building permits is a measure to ensure Wal-Mart's transportation-related fee schedule payment, not a measure to thwart it.

Accordingly, we will reverse the judgment denying plaintiffs' petition for writ of mandate as to this specific issue, and direct the trial court to grant the petition to that extent—i.e., confirm that Wal-Mart has paid or will pay "all transportation-related fees to [the City] in accordance with the latest adopted fee schedule," as required by MM TRANS-2a.

2. Substantial evidence infeasibility.

Plaintiffs claim that virtually all the evidence in the record shows that prior to the Project's approval, it was feasible for the City to include, in the City's Traffic Program, mitigation measures for the Project's contribution to the Year 2030 cumulative traffic impacts to the eight intersections at issue on Oroville Dam Blvd.; and therefore, the City's finding that it was infeasible to mitigate these impacts to less than significant was not based on substantial evidence. Based on this evidentiary posture, plaintiffs maintain that Wal-Mart refused to pay its fair share contribution to mitigating these cumulative impacts, and that the City shielded Wal-Mart from paying its fair share so as not to jeopardize the Project.

8

To support their substantial evidence claim, plaintiffs rely on the following three lines of evidence.

First, plaintiffs point to the City's resolution No. 7471, which defined acceptable traffic service levels based on the less impacted roadway segments along Oroville Dam Blvd. rather than on the customary more impacted intersections. The City repealed this resolution, though (albeit in the face of litigation from plaintiffs).

Second, plaintiffs maintain that almost all of the relevant fair share information for the Project had been compiled for the earlier DEIR, and simply needed to be incorporated into the later PRDEIR. However, the PRDEIR necessitated a new traffic study, and the relevant traffic information in the DEIR comprised only percentages of Wal-Mart's cumulative impact contribution to each of the eight intersections at issue (not estimated costs). As plaintiffs acknowledge in their reply brief, "the City knew Wal-Mart's fair share percentage of the [Oroville Dam Blvd. intersection impacts] and . . . *only needed* to determine the cost of the improvements and take the administrative action of adding the needed intersection improvements to the [Traffic Program]." (Italics added.) This "only needed" to-do list is a substantial one, however.

And, third, plaintiffs cite to a December 2009 e-mail communication from Wal-Mart's attorney to the City. That communication asks "the City to confirm what improvements [the City] will be including in the [Traffic Program] that will be used to calculate the traffic fee"; and notes, "the City has stated it has now identified the final improvements that will be included in the [Traffic Program]." Although this communication was made about a year before the City approved the Project, it also shows that Wal-Mart was willing to pay the traffic fee based on improvements identified in the Traffic Program; as the communication further explained, Wal-Mart simply did not want to pay the fee twice, once to construct the improvement and then again for the improvement.

9

Finally, plaintiffs' substantial evidence contention also rests on a flimsy foundation. The Traffic Program applied to the City as a whole; the eight Oroville Dam Blvd. intersections at issue were just a fragment of its focus.

We conclude there is substantial evidence to support the City's finding that it was infeasible to mitigate to less than significant the Project's Year 2030 cumulative traffic impact to the eight intersections of Oroville Dam Blvd., given that the Traffic Program had not yet been completed and adopted when the City approved the EIR and the Project.

## II. Analysis of Hydrological Impacts[*]

Plaintiffs raise four contentions on this subject.

### A. Baseline Description of Hydrological Conditions

Plaintiffs have two concerns here.

The first concern is with "Mitigation Measure HYD-4" (MM HYD-4), which specifies that, prior to issuance of grading permits for the Project, Wal-Mart shall retain a qualified civil engineer to prepare and submit a drainage plan for City's approval that identifies onsite drainage facilities to ensure that runoff from the Project site is released at a rate no greater than that of the "pre-development condition."

Plaintiffs claim the EIR fails to analyze existing water percolation rates through the highly permeable mining tailings on the Project site and, without that information, it cannot be determined whether there is a feasible drainage solution that will ensure the runoff rate is no greater than pre-development conditions, as MM HYD-4 requires.

The EIR, however, included a geotechnical investigation. This investigation analyzed the surface and subsurface composition of the Project site, including the mining tailings thereon, and performed three distinct tests of how those conditions currently

_____

[*] See footnote, *ante*, page 1.

affect water percolation.  Furthermore, baseline information about the percolation rates of the mining tailings on the Project site will be part of a required study for the MM HYD-4 drainage plan.  Finally, the MM HYD-4 standard of no greater runoff rate is designed to avoid a project-related increase in flooding of adjacent properties during storm events, a standard ascertainable from pre-development flood information.

Plaintiffs' second concern centers on "Mitigation Measure HYD-2a" (MM HYD-2a).  That mitigation measure specifies that prior to issuance of building permits for the Project, Wal-Mart shall submit a stormwater management plan for the City's approval that identifies pollution prevention measures to prevent polluted runoff from leaving the Project site, that accounts for the Project's net increase of nearly 21 acres of impervious surface area, and that ensures that water quality in downstream water bodies is not degraded.  MM HYD-2a specifies 11 pollution prevention measures that this plan must include, but is not limited to; in a response to comments on stormwater quality, the EIR notes that these prevention measures have been "widely employed and . . . demonstrated to be effective means at controlling and preventing pollution from entering downstream waterways."

Plaintiffs claim the EIR fails to include information about the baseline water quality conditions at the Project site and the receiving water body, the nearby Feather River.

As for existing water quality, the EIR states, however, that "[t]here are no water bodies in [the City] area listed on the 2006 [federal] Clean Water Act['s] . . . list of impaired water bodies.  As such, no [pollution-remedial] Total Maximum Daily Load requirements are in effect for any surface water bodies in the Oroville area." Furthermore, as with percolation rates, existing runoff from the Project site will be part of the study for the MM HYD-4 drainage plan.

11

We conclude that the EIR's description of the challenged baseline hydrological information is adequate.

## B. *Drainage Facilities and Drainage Impacts*

As for the issue of drainage facilities, plaintiffs' hydrology expert commented in the EIR process that because of the highly permeable mining tailings on the Project site, the Project would need facilities to temporarily store about 32 acre-feet of water each year to ensure that the runoff rate is no greater than pre-development conditions, as MM HYD-4 requires.

Plaintiffs contend the EIR is inadequate because it fails to describe a stormwater detention basin to address this comment. However, the Project's documents included a plan submitted to the City's Design Review Board that showed a preliminary design schematic illustration of proposed-site stormwater catch basins, including how those basins would connect to the proposed drainage system for the Project. All that plaintiffs can muster in their reply brief to this fact is the tepid remark that "[t]his reference provides no additional information about the stormwater detention basin or other facilities to retain stormwater on site."

As for the issue of drainage impacts, plaintiffs assert that, in view of the highly permeable mining tailings on the Project site, the Project's 21-acre increase of impervious surface, the site's location "almost adjacent" to the Feather River, and the comments related thereto by plaintiffs' hydrology expert and Caltrans, the EIR was required to provide a drainage study that would provide more information about the Project's drainage impacts and the feasibility of mitigation.

The EIR describes the existing drainage system and the proposed new drainage system, and sets forth three detailed pages of responses to comments on drainage and stormwater quality. Furthermore, this issue of drainage impacts covers the same ground

12

that plaintiffs' baseline issues regarding drainage and pollution runoff covered in part II.A., *ante*, of this discussion.  We need not repeat that discussion here.

### C.  Deferral of Mitigation

Plaintiffs contend that MM HYD-2a (i.e., the stormwater management/pollution runoff plan) and MM HYD-4 (i.e., the drainage plan) improperly defer formulation of specific mitigation strategies until after the Project's approval.  We disagree.

Deferral of mitigation specifics is permissible where the relevant agency commits itself to mitigation and articulates specific performance criteria or standards that must be met for the project to proceed.  (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 793-794; *Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1275-1276.)  The two challenged mitigation measures comply with this principle.

MM HYD-2a states that prior to the issuance of building permits Wal-Mart must submit for the City's approval a stormwater management plan that contains, but is not limited to, 11 specified pollution prevention measures to prevent polluted runoff from leaving the Project's site.  These specified measures, the EIR notes, have been "widely employed and . . . demonstrated to be effective means at controlling and preventing pollution from entering downstream waterways," and implement "Best Management Practices" in controlling stormwater runoff quality.

MM HYD-4 provides that prior to the issuance of grading permits Wal-Mart shall retain a qualified civil engineer to prepare and submit for the City's approval a drainage plan "that will ensure that runoff from the [P]roject site is released at a rate no greater than that of the pre-development condition."  This standard seeks to avoid any project-related increase in flooding of adjacent properties during storm events, a standard, as noted, ascertainable from pre-development flood information.

13

## D. *Water Quality Impacts*

As to this issue, plaintiffs again argue, in a nutshell, that "[b]ecause of the high permeability of the site and the Project's contribution of oil, gas and heavy metals to stormwater runoff, the EIR needs to provide additional information about the stormwater pollution control facilities to comply with CEQA." We disagree, for the reasons already stated.

## III. Greenhouse Gas Emissions[*]

Plaintiffs raise two basic issues relating to greenhouse gas (GHG) emissions. The first one is:

### A. *Substantial Evidence Does Not Support the City's Finding That the Project's GHG Emissions Will Have a Less Than Significant Environmental Impact After Mitigation*

We agree.

### *Legal Background*

The EIR primarily analyzed the environmental impact of the Project's GHG emissions according to a CEQA Guideline that was adopted around the same time the DEIR was completed—CEQA Guidelines section 15064.4, entitled "Determining the Significance of Impacts from Greenhouse Gas Emissions." This Guideline provides in pertinent part:

"(a) The determination of the significance of greenhouse gas emissions calls for a careful judgment by the lead agency consistent with the provisions in [CEQA Guidelines] section 15064 [(§ 15064, subd. (b) requires lead agencies to evaluate potential environmental effects based on scientific and factual data, to the extent possible)]. A lead agency should make a good-faith effort, based to the extent possible on scientific and factual data, to describe, calculate or estimate the amount of greenhouse gas emissions

---

[*] See footnote, *ante*, page 1.

resulting from a project. A lead agency shall have discretion to determine, in the context of a particular project, whether to:

"(1) Use a model or methodology to quantify greenhouse gas emissions resulting from a project, and which model or methodology to use. . . . ; and/or

"(2) Rely on a qualitative analysis or performance based standards.

"(b) A lead agency should consider the following factors, among others, when assessing the significance of impacts from greenhouse gas emissions on the environment:

"(1) The extent to which the project may increase or reduce greenhouse gas emissions as compared to the existing environmental setting;

"(2) Whether the project emissions exceed a threshold of significance that the lead agency determines applies to the project[;]

"(3) The extent to which the project complies with regulations or requirements adopted to implement a statewide, regional, or local plan for the reduction or mitigation of greenhouse gas emissions. Such requirements must be adopted by the relevant public agency through a public review process and must reduce or mitigate the project's incremental contribution of greenhouse gas emissions. . . ."

Neither the City nor the Butte County Air Quality Management District, at the time of the EIR, had adopted a plan or strategy for reducing GHG emissions that would apply to the Project. As a result the City adopted, as a threshold-of-significance standard for determining whether the Project's GHG emissions constituted a significant environmental impact, the following standard: "[W]hether the [P]roject would significantly hinder or delay California's ability to meet the reduction targets contained in [Assembly Bill No.] 32"—the state legislation addressing GHG emissions (the California Global Warming Solutions Act of 2006). (Health & Saf. Code, § 38500 et seq., enacted by Assem. Bill No. 32 (2005-2006 Reg. Sess.) (hereafter Assembly Bill 32).) As the EIR

15

explains, Assembly Bill 32 "focuses on reducing greenhouse gases [including carbon dioxide] to 1990 levels by the year 2020. Pursuant to the requirements in [Assembly Bill] 32, a Scoping Plan was adopted [which] outlines actions recommended to obtain that goal." According to the EIR, the Scoping Plan (developed by the State Air Resources Board) "calls for [a] . . . reduction in California's [GHG] emissions, cutting approximately 30 percent from business-as-usual emission levels projected for 2020, or about 10 percent from today's levels [i.e., 2010, when the EIR here was drafted]."

Besides the formal Scoping Plan, the EIR also analyzed the Project's GHG emissions under the following informal/voluntary guides for mitigating GHG emission impacts: the State Air Resources Board's "Early Action Measures" (which focus on cool roofs and pavements, and shade trees); the California Attorney General's Web site list of "CEQA Mitigations for Global Warming Impacts" (which focus on water and energy conservation; recycling promotion; waste reduction; and non-vehicular accessibility); and a 2008 "white paper" from the California Air Pollution Control Officers Association (which focuses on matters similar to the previous two guides).

### *Factual Background*

The EIR found the following.

Nearly all of the Project's GHG emissions will be in the form of carbon dioxide, except for refrigerant use which does not emit that gas (refrigerant use will comprise about 17 percent of the Project's total GHG emissions).

At buildout, the Project's (operational) GHG emissions will constitute nearly 15,000 metric tons of carbon dioxide equivalents per year, which is 0.003 percent of California's 2004 emissions. About 68 percent of these emissions will be from motor vehicles. The Project's remaining GHG emission sources, in terms of percentage of contribution, are as follows: natural gas use—4 percent; electrical generation—11 percent; and refrigerant use—as noted, 17 percent.

16

The mitigation measures adopted for the Project's GHG emissions comprise solar reflective paving and roofing materials (MM AIR-8a, MM AIR-8d); the turning off of truck engines in the loading docks (MM AIR-8b); refrigerant measures that reduce leaks and increase recycling (MM AIR-8c); energy efficiency measures, principally involving lighting, heating, cooling, and refrigeration (MM AIR-8d); and a landscaping plan, emphasizing shade trees in the parking lot (MM AIR 8-e).

Based on this mitigation, the EIR concluded that, since the Project's contribution to California's GHG emissions is less than significant (literally, miniscule), the Project would not significantly hinder or delay California's ability to meet the GHG reduction targets contained in Assembly Bill 32; and, therefore, the Project's environmental impacts from GHG emissions are less than significant.

*Analysis*

The City properly adopted Assembly Bill 32's reduction targets for GHG emissions as the threshold-of-significance standard in determining whether the Project's GHG emissions constituted a significant environmental impact. The same standard was deemed proper in *Citizens for Responsible Equitable Environmental Development v. City of Chula Vista* (2011) 197 Cal.App.4th 327 (*Citizens*); the project there was a newer, larger Target store to replace an older one (*id.* at pp. 335-336; see *id.* at p. 330).

The problem is the City improperly applied this proper standard in concluding that the Project's environmental impacts from GHG emissions are less than significant. *Citizens,* again, exemplifies the model, showing us a proper way to apply the Assembly Bill 32 threshold-of-significance standard.

As *Citizens* explains, the GHG analysis there "listed the [GHG] emissions for 'business as usual' for the existing Target store and the proposed store at 8,280 metric tons per year and 10,337 metric tons per year, respectively. Thus, under 'business as usual' the proposed Target store would increase greenhouse gas emissions by 2,057

17

metric tons.  However, through the implementation of energy saving measures, the . . . greenhouse gas emissions for the proposed store are reduced to 7,381 metric tons per year, or 2,956 metric tons *less than* 'business as usual.'  This amounts to a 29 percent reduction from business as usual" (*Citizens*, *supra*, 197 Cal.App.4th at p. 337), more than meeting the Assembly Bill 32 target reduction of 25 percent for the year 2020 from business-as-usual emissions (this 25 percent figure was estimated by the GHG analysis in *Citizens*).  Furthermore, the energy-saving measures in *Citizens* reduced existing GHG emissions by nearly 900 metric tons, more than meeting Assembly Bill 32's alternative target reduction of 10 percent from current (2010) emissions (this 10 percent figure is set forth in the Scoping Plan for Assembly Bill 32, according to the EIR here).  (*Citizens*, *supra*, at p. 337; see *id.* at p. 336.)

Drawing from *Citizens*, we conclude the City misapplied the Assembly Bill 32 threshold-of-significance standard in two related ways:  (1) by applying a meaningless, relative number to determine insignificant impact; and (2) by failing to ascertain the *existing* Wal-Mart's GHG emissions, and the impact on GHG emissions from the Project's mitigation measures.

First, the City noted that the Project, at buildout, would emit operationally about 15,000 metric tons of carbon dioxide equivalents yearly, which is 0.003 percent (i.e., just 3 one-thousandths of 1 percent) of California's 2004 GHG emissions.  This relative comparison is meaningless, though, in determining the Project's environmental impact regarding GHG emissions.  It conjures a comparison worse than apples to oranges.  Of course, *one* store's GHG emissions will pale in comparison to those of the world's eighth largest economy.  The relevant question to be addressed in the EIR is not the relative amount of GHG emitted by the Project when compared with California's GHG emissions, but whether the Project's GHG emissions should be considered significant in light of the threshold-of-significance standard of Assembly Bill 32, which seeks to cut

18

about 30 percent from business-as-usual emission levels projected for 2020, or about 10 percent from 2010 levels. (See *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 118-120 [discussing an analogous issue of how to determine whether a project's relatively small, additional environmental impact is significant in an area already highly impacted].)

Second, the City misapplied the Assembly Bill 32 threshold-of-significance standard by failing to calculate the GHG emissions for the existing Wal-Mart and failing to quantitatively or qualitatively ascertain or estimate the effect of the Project's mitigation measures on GHG emissions (MM AIR-8a through MM AIR-8e). (See CEQA Guidelines, § 15064.4, subd. (a).) Without these determinations, ascertaining whether Assembly Bill 32's target reductions are being met is difficult if not futile. The EIR quantified the GHG emissions for the *proposed* Project (precisely 14,817 metric tons of carbon dioxide equivalents per year for operational emissions) and the sources comprising those emissions in percentage terms (motor vehicle—68 percent; natural gas—4 percent; electrical generation—11 percent; refrigerant use—17 percent), but failed to do so for the *existing* Wal-Mart store. Surely, if these precise calculations could be done for the *proposed* Project, something similar can be done for the *existing* Wal-Mart. Nor did the EIR make any attempt to determine or estimate the quantitative or qualitative effect on GHG emissions from MM AIR-8a through MM AIR-8e. Consequently, the EIR does not sufficiently show whether Assembly Bill 32's target reductions are being met. These calculations were done in *Citizens*. (*Citizens*, *supra*, 197 Cal.App.4th at p. 337.) Such calculations and estimates, or a reasonable equivalent, must be done here.

Wal-Mart, in claiming the EIR properly applied the Assembly Bill 32 threshold-of-significance standard, relies primarily on two factors: (1) the measures set forth in the

Assembly Bill 32 Scoping Plan to reduce GHG emissions; and (2) a particular traffic study and conclusion.

The Assembly Bill 32 Scoping Plan, as noted, was developed by the State Air Resources Board and outlines measures (transportation-, energy-, and environmental-related measures) to achieve the threshold-of-significance standard of Assembly Bill 32, which, according to the EIR, seeks to cut about 30 percent from business-as-usual emission levels projected for 2020, or about 10 percent from 2010 levels. The EIR recognizes, however, that "most of the reduction measures [specified in the Scoping Plan for reducing GHG emissions] are not applicable to the [P]roject." As Wal-Mart explains in its respondent's brief on appeal: "The City considered the provisions of 'Scoping Plan Measures' . . . to achieve [Assembly Bill] 32 targets. Those that related to transportation were inapplicable to the Project because they had to be implemented at a statewide level." Thus, while the energy- and environmental-related measures of the Scoping Plan may apply to the Project, the transportation-related measures do not; and, as we have seen, transportation-related GHG emissions comprise nearly 70 percent of the Project's GHG emissions.

By placing great weight on Scoping Plan consistency to sustain the City's finding that the Project's GHG emissions will have a less than significant impact after mitigation, Wal-Mart ignores the elephant in the room—68 percent of the Project's GHG emissions come from motor vehicles. As noted, the EIR does not provide any figures regarding the existing Wal-Mart's GHG emissions, or any figures regarding the effect of the Project's mitigation measures on GHG emissions (MM AIR-8a through MM AIR-8e, which are largely energy- and environmental-related measures). (Contra, *Citizens*, *supra*, 197 Cal.App.4th at p. 337.)

Nor does the traffic study and conclusion, upon which Wal-Mart relies, help matters. The EIR, in its section on energy conservation, citing the traffic study and

20

conclusion, states: "The Institute of Transportation Engineers[,] Trip Generation [(8th ed. 2008)] indicates that a freestanding discount superstore (e.g., a [Wal-Mart] with a grocery component) generates 4.09 fewer daily trips per 1,000 square feet than a freestanding discount store (e.g., a conventional [Wal-Mart] without a grocery component)." From this, the EIR concludes that a one-stop shopping destination (i.e., a superstore) may reduce multiple and out-of-town trips for the City's residents. However, the EIR, in its section on GHG emissions, concludes that the Project will "not result in any significant changes in vehicle miles traveled"; and, in yet another section (on transportation), suggests that the Project is so large a retail destination, there will be round trips to it of up to 40 miles from neighboring communities. These speculative and contradictory conclusions do not close the evidentiary sufficiency gap involving the City's finding that the Project's GHG emissions will have a less than significant environmental impact after mitigation.

We conclude there is insufficient evidence to support the City's finding that the Project's GHG emissions will have a less than significant environmental impact after mitigation. [END OF PUBLISHED PART III.A.]

### B. MM AIR-8a Complies with CEQA

In their second contention involving GHG emissions, plaintiffs take issue with "Mitigation Measure AIR-8a" (MM AIR-8a).

MM AIR-8a states: "Prior to issuance of the certificate of occupancy, [Wal-Mart] shall install paving materials with increased solar reflectivity such as light-colored aggregate in appropriate areas of the [P]roject site. This mitigation measure shall not apply in areas where paving materials must meet specific performance criteria."

Plaintiffs argue that MM AIR-8a does not provide any specific performance criteria, thereby allowing "the City to pave the entire parking lot in asphalt" and

21

rendering the mitigation measure ineffective.  (See § 21002 [mitigation measures must be effective].)  We disagree.

A reasonable reading of MM AIR-8a makes it effective:  Wal-Mart is required to use solar reflective pavement in appropriate areas, given the type of traffic that will use that pavement.

## IV.  Notice*

Plaintiffs contend the City violated CEQA's notice requirements in two respects: (1) by failing to post with the County Clerk the "Notice of Availability" (NOA) of the DEIR and the PRDEIR; and (2) by failing to mail the NOA of the PRDEIR to the individuals on the notice list, including plaintiffs.

As relevant here, CEQA requires that the pertinent public agency provide NOA of any draft EIR in the following three ways:  (1) publish the NOA in a newspaper of general circulation (§ 21092); (2) post the NOA for 30 days with the County Clerk (§ 21092.3); and (3) mail the NOA to any individual who has properly requested such notice (§ 21092.2).  As also relevant here, CEQA sets forth a 45-day public review period for a draft EIR.  (§ 21091, subd. (a).)

As for publication, there is no dispute that the City properly published the NOA for the DEIR and the PRDEIR.

As for posting, there is some evidence that the DEIR's NOA was posted, but no such evidence for the PRDEIR.

As for mailing, the City did not mail the NOA for the PRDEIR, but did mail the NOA for the final EIR, and the final EIR included the PRDEIR.

---

* See footnote, *ante*, page 1.

As for timing, plaintiffs had about 10 days to review the PRDEIR before the November 10, 2010 Planning Commission hearing on EIR approval, and 46 days to review the PRDEIR before the December 14, 2010 (continued) City Council hearing on EIR approval, based on the mailed NOA for the final EIR (which, as noted, included the PRDEIR).

Where the failure to comply with CEQA procedural law subverts CEQA's purposes by omitting information from, or foreclosing participation in, the environmental review process, the error is prejudicial. (*Schenck v. County of Sonoma* (2011) 198 Cal.App.4th 949, 958-960 (*Schenck*); *Rural Landowners Assn. v. City Council* (1983) 143 Cal.App.3d 1013, 1023 (*Rural Landowners*); see *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 484-487.) At least in connection with section 21092 (i.e., publication; and presumably in connection with the other notice statutes), CEQA's requirements for public notice are fulfilled if the public agency makes a good faith effort to follow the prescribed procedures for giving notice (assuming CEQA's informational and participation purposes have not been subverted). (*Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 924; see *Schenck*, *supra*, at pp. 958-960*; Rural Landowners*, *supra*, at p. 1023.) As we shall see, CEQA was not subverted by the legally deficient notice given here; therefore, this deficiency was not prejudicial and does not require reversal.

Plaintiffs were given about 10 days' notice of the PRDEIR, before the Planning Commission hearing on EIR approval took place on November 10, 2010; and 46 days of notice before the City Council approved the EIR on December 14, 2010.

For the Planning Commission hearing, plaintiffs (through counsel) submitted extensive written comments regarding the PRDEIR, and they actively participated at that hearing, along with 27 other citizens who addressed the Commission.

23

Plaintiffs appealed the Planning Commission decision approving the EIR to the City Council, and again submitted extensive written opposition to the EIR.

The City Council held a hearing on December 2, 2010, regarding EIR approval and plaintiffs' appeal. Pursuant to law, this hearing was de novo (i.e., independent of the Planning Commission's decision). (See Gov. Code, §§ 65903-65904; see also *BreakZone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1221.)

More than 25 citizens addressed the Council at the December 2 hearing. The City Council continued the hearing to December 14, 2010, to enable staff to review and respond to plaintiffs' EIR opposition. The City obtained from its own consultants more than 100 pages of responses to plaintiffs' EIR comments.

After considering plaintiffs' views, along with those of several other citizens, the City Council approved the EIR at the December 14 hearing.[2]

Given the final EIR notice provided here to plaintiffs (which included notice of the PRDEIR); the properly published NOA for the DEIR and the PRDEIR; the opportunity for plaintiffs to genuinely participate at the Planning Commission hearing; the 46-day review period preceding the continued City Council hearing; the de novo nature of the City Council hearing; the opportunity for plaintiffs to fully participate at the City Council hearing and have their EIR comments addressed; and the extensive participation by the public at the Planning Commission and the City Council hearings, we conclude that the legally deficient notice here did not subvert CEQA by omitting information from, or limiting participation in, the environmental review process. (*Schenck*, *supra*,

---

[2] At oral argument in this court, plaintiffs' counsel raised for the first time that the City's insufficient notice foreclosed plaintiffs from being able to adequately respond to the City's responses to the EIR comments plaintiffs submitted for the December 2 hearing. Plaintiffs failed to assert this point earlier and cannot raise it for the first time at oral argument. (*Starzynski v. Capital Public Radio, Inc.* (2001) 88 Cal.App.4th 33, 38, fn. 2.)

198 Cal.App.4th at pp. 958-960; *Rural Landowners*, *supra*, 143 Cal.App.3d at p. 1023; see *Rural Landowners*, at p. 1020.)  Consequently, that deficient notice was not prejudicial and does not require reversal.  (*Schenck*, *supra*, 198 Cal.App.4th at pp. 958-960; *Rural Landowners*, *supra*, 143 Cal.App.3d at p. 1023; see *Rural Landowners*, at p. 1020.)  [REMAINDER OF OPINION TO BE PUBLISHED]

## DISPOSITION

We reverse the judgment to the extent it denied plaintiffs' petition for writ of mandate—and we remand this matter to the trial court to grant the petition—as to the following two EIR issues:  (1) to ensure Wal-Mart has paid or will pay "all transportation-related fees to [the City] in accordance with the latest adopted fee schedule," as required by MM TRANS-2a of the EIR approved by the City; and (2) to ensure the Project's GHG emissions constitute a significant or a less than significant environmental impact in light of a proper application of the threshold-of-significance standard of Assembly Bill 32, which, according to the EIR, seeks to cut about 30 percent from business-as-usual emission levels projected for 2020, or about 10 percent from 2010 levels.  As part of this analysis, the EIR must set forth how the Project's EIR-specified operational GHG emissions compare to those for the existing Wal-Mart store, and must provide a quantitative or qualitative determination or estimate of the mitigation measures' effect on GHG emissions (MM AIR-8a through MM AIR-8e).  In all other respects, the judgment is affirmed.  Plaintiffs are awarded their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(3).)  (*CERTIFIED FOR PARTIAL PUBLICATION*)


                                                               BUTZ               , Acting P. J.

We concur:


               MAURO           , J.


               MURRAY          , J.