Filed 11/7/13; pub. order 12/4/13 (received from court 12/30/13; see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PARKER SHATTUCK NEIGHBORS et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> BERKELEY CITY COUNCIL et al., <br><br>     Defendants and Respondents; <br><br> CITYCENTRIC INVESTMENTS, LLC et al., <br><br>     Real Parties in Interest and Respondents. | A136873 <br><br> (Alameda County Super. Ct. No. RG12617535) |

This action was brought under the California Environmental Quality Act (CEQA)[1] to challenge a proposed mixed-use commercial and residential project approved by the City of Berkeley. Appellants are Parker Shattuck Neighbors and two individuals (collectively Parker Shattuck),[2] who contend the City violated CEQA by approving the project without an environmental impact report (EIR). Parker Shattuck petitioned for a writ of mandate, maintaining that an EIR was required because pre-existing contamination on the site poses health risks to the project's construction workers and future residents. We affirm the trial court's denial of the writ because Parker Shattuck

---

[1] Public Resources Code sections 21000 through 21178. Unless otherwise indicated, all further statutory references are to that code.

[2] Counsel for Parker Shattuck notified us that one of these individuals, Patti Dacey, died while this appeal was pending.

1

has failed to identify substantial evidence supporting a fair argument that there may be a significant effect on the environment because of these potential health risks.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

The Parker Place Project is proposed by CityCentric Investments, LLC and Parker Place Group, LLC and was approved by the Berkeley City Council.[3] When finished, it will consist of three buildings on what are currently three different parcels. A five-story mixed-use building with an underground parking garage will be built at 2600 Shattuck Avenue, another five-story mixed-use building will be built at 2598 Shattuck Avenue, and a three-story residential building will be built at 2037 Parker Street. All told, the project will include 155 residential units and over 20,000 square feet of commercial space.

The three parcels are currently occupied by a car dealership, Berkeley Honda. The showroom, offices, and service garage are located at 2600 Shattuck Avenue, and a sales lot is located at 2598 Shattuck Avenue and 2037 Parker Street. Since 1923, 2600 Shattuck Avenue has been the site of a car dealership and service garage, and from at least 1922 to 1960, 2598 Shattuck Avenue was the site of a service station.

Before buying the properties, the current owner commissioned three environmental site-assessment reports, which were issued in two phases. The Phase I report was issued in December 2005, and it stated that the properties had a history of containing underground storage tanks. Underground storage tanks are used to store hazardous substances, such as gasoline. (See Health & Saf. Code, § 25281, subd. (y)(1).) In 1988, a 1000-gallon underground storage tank was removed from 2598 Shattuck Avenue, and the Berkeley Health and Human Services Department issued a letter confirming there was "no significant soil contamination resulting from a discharge in the

---

[3] Respondents are CityCentric Investments, LLC and Parker Place Group, LLC (collectively, CityCentric), which are also the real parties in interest, and the Berkeley City Council and the City of Berkeley (collectively, the City).

area surrounding the underground storage tank." In 1990, a 500-gallon tank was removed from 2600 Shattuck Avenue. Fire Department records also indicated there were or might once have been several other underground storage tanks. The Phase I report recommended using ground-penetrating radar to clarify whether there were any other underground storage tanks and conducting an investigation to assess ground contamination.

These recommendations were accepted, and the results were described in the Phase II report issued in March 2006. The ground-penetrating-radar study located a suspected underground storage tank under the sidewalk next to 2600 Shattuck Avenue and recommended its removal. It also identified a concrete pad at 2598 Shattuck Avenue that might conceal an underground storage tank. The ground-contamination investigation collected soil samples from twenty borings near areas of potential contamination, and water samples were collected where the borings encountered groundwater. Various volatile organic compounds (VOCs) were detected in two soil samples and a water sample, but they did not "exceed the San Francisco Regional Water Quality Control Board [Regional Board] . . . Environmental Screening Levels . . ., or there are no [environmental-screening levels] established for the contaminant." The report recommended additional soil and water sampling in other areas of concern, including under the concrete pad to determine if there was petroleum in the soil and thus whether an underground storage tank might be there.

This recommendation was accepted, and the results were announced in a supplemental Phase II report. Although petroleum hydrocarbons, arsenic, and cobalt were detected in amounts exceeding Regional Board environmental-screening levels for commercial/industrial land use, the report noted that the hydrocarbon contamination was "not likely" to "require cleanup" and that the arsenic and cobalt were probably "naturally occurring." No contaminants were detected in amounts exceeding environmental-screening levels for groundwater that was not a potential source of drinking water. The supplemental report also determined that there was no underground storage tank or soil contamination under the concrete pad.

The storage tank under the sidewalk next to 2600 Shattuck Avenue was removed in April 2006. Because hydrocarbon contamination was observed in the soil surrounding the tank, 75 tons of soil were also removed from the site. The site was then placed on a list, known as the "Cortese list," that is comprised of potentially contaminated sites and includes sites with "underground storage tanks for which an unauthorized release report is filed." (Gov. Code, § 65962.5, subd. (c)(1).)

In January 2007, the Regional Board issued a closure letter finding that no further corrective action related to the petroleum contamination was necessary at the project's site. A printout of a State Water Resources Control Board website identifying sites on the Cortese list showed that the project's site remained on the list but was given the status of "case closed" the day after the Regional Board's closure letter was issued.

Almost two years later, in December 2008, CityCentric applied to begin constructing the project. A use permit was finally approved in 2010 after the City determined that CEQA did not apply because the project fell under a regulatory exemption for urban "In-Fill Development Projects."[4]

Parker Shattuck brought a writ of mandate to challenge the City's approval of the project in *Parker Shattuck Neighbors v. Berkeley City Council* (Super. Ct. Alameda County, 2011, No. RG10544097). Although the trial court rejected Parker Shattuck's various arguments under CEQA, finding they were not raised at the administrative level, it granted the writ and ordered the City to vacate approval of the project after it found that the City had allowed the project to be modified without first holding a public hearing. The City vacated the project's approval in October 2011.

In the second round of administrative proceedings, the City assumed the CEQA exemption for urban in-fill projects (Guidelines, § 15332) was inapplicable. On

---

[4] The in-fill exemption is found in section 15332 of title 14 of the California Code of Regulations. This section is part of the Guidelines for Implementation of the California Environmental Quality Act, which are set forth in title 14 of the California Code of Regulations, sections 15000 through 15387. All further references to Guidelines are to these regulations.

4

November 1, 2011, the City released for public comment a proposed mitigated negative declaration (MND), which incorporated the initial study.

The proposed MND found that the project would potentially affect several environmental factors, including the category entitled "Hazards & Hazardous Materials." A checked box indicated that one potential environmental impact was that the project would "[b]e located on a site which is included on [the Cortese] list . . . and, as a result, would . . . create a significant hazard to the public or the environment." In its discussion of this potential effect, the MND noted that although the project site appeared on the Cortese list, "both [the City's Toxics Management Division] and the [Regional Board] ha[d] found that the site has undergone adequate discovery and remediation, with the result that the site poses no significant hazard to the public or the environment." The proposed MND also noted that "according to [the City's Toxic Management Division], [t]he recognized soil and groundwater impacts [did] not appear to extend beyond the property boundaries" because various characteristics of petroleum oils made it unlikely they would spread in the soil, groundwater, or air. The MND concluded that mitigation could reduce any potential impact to "less than significant" by "ensur[ing] that there [would] be no significant hazard to the public or the environment during any necessary remediation work during or after construction of the project."

Parker Shattuck submitted comments on the proposed MND, including comments from Matthew Hagemann, a hydrogeologist and expert on air quality. Relying on Hagemann's comments, Parker Shattuck argued that an EIR was required because the MND's mitigation measures failed adequately to address the health threat of the toxic soil contamination to construction workers and future residents of the project. A week later, Parker Shattuck submitted additional comments, which primarily discussed comments on the MND submitted by the East Bay Municipal Utilities District (EBMUD). EBMUD's letter informed the City that the utilities district "[would] not inspect, install or maintain pipeline or services" in soil or groundwater that was contaminated above certain levels and until the district was able to review contamination data and remediation plans.

5

Parker Shattuck argued that these comments further demonstrated that the MND's mitigation measures were insufficient.

The Berkeley Zoning Adjustments Board held a public hearing on December 8 and adopted the MND. Parker Shattuck appealed the decision to the Berkeley City Council. In January 2012, the City Council approved the project.

Parker Shattuck filed this lawsuit in February 2012, seeking a writ of mandate to compel the City to set aside approval of the MND and project and to prepare an EIR. The lawsuit also sought injunctive relief, costs, and attorney fees. Although during the administrative proceedings Parker Shattuck had raised other concerns about the project, such as the potential for air pollution and noise, the petition's primary contentions were that the site's soil contamination is a significant environmental impact requiring an EIR and the MND failed to provide adequate mitigation measures.

The trial court issued a tentative order denying the petition, and a hearing occurred over two days in July 2012. The court then issued an order and proposed statement of decision denying the petition and entered judgment. Parker Shattuck timely appealed.

## II.
### DISCUSSION

### A.    *The Background of CEQA.*

CEQA reflects the California state policy that "the long-term protection of the environment, consistent with the provision of a decent home and suitable living environment for every Californian, shall be the guiding criterion in public decisions." (§ 21001, subd. (d).) "[T]o implement this policy," CEQA and the Guidelines "have established a three-tiered process to ensure that public agencies inform their decisions with environmental considerations." (*Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 112 (*Davidon Homes*).) A public agency must "conduct a preliminary review in order to determine whether CEQA applies to a proposed activity." (*Ibid.*) At this stage, the agency must determine whether any of CEQA's statutory exemptions apply. (*Concerned Dublin Citizens v. City of Dublin* (2013) 214 Cal.App.4th 1301, 1309.) If the project is in an exempt category for which there is no exception, " 'no

6

further environmental review is necessary.' " (*Id.* at p. 1310; *Save the Plastic Bag Coalition v. County of Marin* (2013) 218 Cal.App.4th 209, 220.)

If the project is not exempt from CEQA, the next step is to conduct an initial study. (*Davidon Homes*, *supra*, 54 Cal.App.4th at p. 113.) The initial study determines whether there is " 'substantial evidence that the project may have a significant effect on the environment.' " (*Architectural Heritage Assn. v. County of Monterey* (2004) 122 Cal.App.4th 1095, 1101 (*AHA*).) If there is no such evidence, " 'CEQA excuses the preparation of an EIR and allows the use of a negative declaration.' " (*Ibid.*) If there is such evidence, " 'but revisions in the project plans "would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur" and there is no substantial evidence that the project as revised may have a significant effect on the environment, [an MND] may be used.' " (*Ibid.*)

If neither type of negative declaration is appropriate, the final step is to prepare an EIR. (*AHA*, *supra*, 122 Cal.App.4th at p. 1101.) Given that "the EIR is the 'heart of CEQA,' " doubts about whether an EIR is required are resolved in favor of preparing one. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123; *AHA* at p. 1102.)

B.     *The Applicable Legal Standards*.

The lead agency must prepare an EIR "whenever substantial evidence supports a fair argument that a proposed project 'may have a significant effect on the environment.' " (*Laurel Heights Improvement Assn. v. Regents of University of California*, *supra*, 6 Cal.4th at p. 1123.) "The fair argument standard is a 'low threshold' test for requiring the preparation of an EIR." (*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 928.) "[F]acts, reasonable assumptions predicated upon facts, and expert opinion supported by facts" all constitute "[s]ubstantial evidence" of a significant effect on the environment, and "[a]rgument, speculation, unsubstantiated opinion or narrative, or evidence that is clearly inaccurate or erroneous, or evidence that is not credible" do not. (Guidelines, § 15064, subd. (f)(5).) As long as there is substantial evidence of a potential significant environmental effect, "contrary evidence is

7

not adequate to support a decision to dispense with an EIR." (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1316.)

An agency's decision under CEQA is reviewed for abuse of discretion. (§§ 21168, 21168.5; *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 945.) " 'Abuse of discretion is shown if (1) the agency has not proceeded in a manner required by law, or (2) the determination is not supported by substantial evidence.' " (*Ibid.*) Review is de novo in the sense that "[t]he appellate court reviews the agency's action, not the trial court's decision." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427.)

When reviewing the agency's determination not to prepare an EIR, we "determine whether substantial evidence supported the agency's conclusion as to whether the prescribed 'fair argument' could be made." (*Friends of "B" Street v. City of Hayward* (1980) 106 Cal.App.3d 988, 1002.) " '[T]he sufficiency of the evidence to support a fair argument' " is a question of law. (*Sierra Club v. County of Sonoma*, *supra*, 6 Cal.App.4th at p. 1318.) When determining whether sufficient evidence exists to support a fair argument, "deference to the agency's determination is not appropriate and its decision not to require an EIR can be upheld only when there is no credible evidence to the contrary." (*Ibid.*)

We limit our review to the administrative record because the agency's determination that an MND is appropriate depends on "the absence of 'substantial evidence in light of the whole record before the . . . agency that the project, as revised, may have a significant effect on the environment.' " (*AHA*, *supra*, 122 Cal.App.4th at p. 1111, italics omitted; see also §§ 21080, subd. (d), 21082.2, subds. (a), (d) [determination whether project will have a significant effect on the environment and whether EIR must be prepared is made "in light of the whole record before the lead agency"].) Parker Shattuck has the burden of proof "to demonstrate by citation to the record the existence of substantial evidence supporting a fair argument of significant environmental impact." (*League for Protection of Oakland's etc. Historic Resources v. City of Oakland* (1997) 52 Cal.App.4th 896, 904.) "Unless the administrative record

8

contains this evidence, and [plaintiffs] cite[] to it, no 'fair argument' that an EIR is necessary can be made." (*South Orange County Wastewater Authority v. City of Dana Point* (2011) 196 Cal.App.4th 1604, 1612-1613 (*SOCWA*).)

> C.   *Parker Shattuck Has Failed to Identify Substantial Evidence Supporting a Fair Argument that the Project's Disturbance of Contaminated Soil May Have a Significant Effect on the Environment.*

Parker Shattuck contends that the City is required to prepare an EIR because the MND contains inadequate measures to mitigate environmental effects that will be caused by "excavating and disturbing toxic soil." It argues that the project will have a significant effect on the environment by threatening the health of construction workers and future residents. We conclude that Parker Shattuck has failed to identify substantial evidence supporting a fair argument that potential health risks to workers and future residents might constitute a significant environmental impact. Accordingly, we need not consider whether the MND contained adequate mitigation measures because such "measures are not required for effects which are not found to be significant." (Guidelines, § 15126.4, subd. (a)(3).)[5]

" 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." (§ 21068.) A change in the "environment" is a "change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance." (Guidelines, § 15382.) A finding of a significant environmental effect is mandatory if "[t]he environmental effects of a project will cause substantial adverse effects on human beings, either directly or indirectly." (§ 21083; Guidelines, § 15065, subd. (a)(4).) In other words, while "[e]ffects analyzed under CEQA must be related to a physical change" (Guidelines, § 15358, subd. (b)), such a change may be deemed *significant* based solely on its impact on people.

---

[5] Parker Shattuck filed a motion requesting that we consider evidence outside of the record to show that the City has now violated the MND's mitigation requirements. We deny the motion because the evidence is immaterial to our decision.

9

1.    The disturbance of contaminated soil can be a physical
change in the environment.

Parker Shattuck argues that disturbing contaminated soil can be a "physical change" in the environment. We agree. (Guidelines, § 15358, subd. (b); *Citizens for Responsible Equitable Environmental Development v. City of Chula Vista* (2011) 197 Cal.App.4th 327, 332 (*CREED*) [in a case involving soil contamination beneath a former gas station, the court held that "it [could] be fairly argued that [the project at issue] may have a significant environmental impact by disturbing contaminated soils"]; see also *Association for a Cleaner Environment v. Yosemite Community College Dist.* (2004) 116 Cal.App.4th 629, 635, 638-640 (*ACE*) [project to remove a shooting range that would not increase the lead contamination already present due to bullets might nevertheless "spread[] [that] contamination, which is a direct physical change in the environment," through increased vehicle and foot traffic and donations of portion of range to another site].)

The City argues that this case is not about the project affecting the environment, but is instead about the environment (i.e., any contaminated soil or groundwater at the site) affecting the project. In support of its position, it relies on several cases holding that the environment's impact on a project is not a " 'significant effect on the environment.' " But these decisions, with one exception, are not directly applicable here because the projects in those cases, unlike the project here, did not involve a physical change in the environment.[6]

In one of the cases, *Baird v. County of Contra Costa* (1995) 32 Cal.App.4th 1464 (*Baird*), the court considered whether an EIR was required for a planned addiction-treatment facility to be built on and adjacent to contaminated sites. (*Id.* at p. 1466.) The plaintiff contended that the "preexisting . . . contamination . . . [would] have an adverse effect on the proposed facility and its residents." (*Id.* at p. 1468, italics omitted.) The court held that "[a]ny such effect [was] beyond the scope of CEQA and its requirement of

_____

[6] The one exception is *City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889 (*Long Beach*), which we discuss further below.

10

an EIR" because "[t]he purpose of CEQA is to protect the environment from proposed projects, not to protect proposed projects from the existing environment." (*Ibid.*) The court explained that an EIR was not required "for a project that might be affected by preexisting environmental conditions but [would] not change those conditions or otherwise have a significant effect on the environment." (*Id.* at p. 1466.)

This holding was premised on the finding that the project would not cause a physical change related to the contamination. The court specifically rejected the plaintiff's contention "that the construction of the facility 'may expose or exacerbate the existing ground contamination' " because all the contamination sources were several hundred feet away from the building site, and there was no evidence that the project would disturb contaminated soil. (*Baird*, *supra*, 32 Cal.App.4th at p. 1468, fn. 1.) The observation implies that the court would have considered the disturbance of contaminated soil an effect on the environment, further supporting our conclusion that disturbing contaminated soil is a physical change that, under the right circumstances, may cause an environmental effect that is cognizable under CEQA.

In another case relied upon by the City, *SOCWA*, the plaintiff operated a sewage-treatment plant next to the site of a proposed development and contended that an EIR was necessary to consider the effect of the plant's odors on the development. (*SOCWA*, *supra*, 196 Cal.App.4th at pp. 1608, 1613.) The court held that CEQA could not be used "to defend the proposed project (the future residences) from a purportedly adverse existing environment (smells from the sewage treatment plant)." (*Id.* at p. 1614.) The court concluded that an EIR was unnecessary because the plaintiff had failed to identify any relevant effect on the environment. (*Id.* at p. 1616.) And the same result was reached in yet another case relied upon by the City, *Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455 (*Ballona*), where the court held that an EIR did not need to address impacts relating to "sea level rise resulting from global climate change" on a proposed mixed-use development where the project itself would not cause sea levels to rise. (*Id.* at pp. 462-464, 475.) Thus, neither *Baird, SOCWA,* nor *Ballona* involved a project that would itself physically change the environment. By contrast,

11

Parker Shattuck has identified an aspect of the project—the disturbance of contaminated soils—that will physically change the environment.

Although we conclude that Parker Shattuck has identified a physical change in the environment that may be cognizable under CEQA, we reject its contention that "the existence of toxic soil contamination at a project site," without any accompanying disturbance or other physical change, "is, in itself, a significant impact requiring CEQA review and mitigation." In making this part of its argument, Parker Shattuck relies on *CREED*. But this reliance is misplaced. *CREED* concluded that there was a fair argument the project could "have a significant environmental impact *by disturbing contaminated soils*," not merely by being built on a contaminated site. (*CREED*, *supra*, 197 Cal.App.4th at p. 332, italics added.)

Nor do we accept Parker Shattuck's argument that an EIR is necessarily required for every project proposed to be built on a site that is mentioned on the Cortese list. In arguing that soil contamination at a project site is sufficient to trigger an EIR, Parker Shattuck cites CEQA's exception to categorical exemption for projects to be built on sites included on the Cortese list, and the legislative history of Assembly Bill No. 869, the bill adding that exception. (§ 21084, subd. (d); Stats. 1991, ch. 1212, § 1; see also § 21092.6, subd. (a) [requiring lead agency to determine whether a project is on a Cortese-list site and disclose that information in CEQA documents].) We agree that the Legislature intended that projects on these sites should not be categorically exempt from CEQA because they may be more likely to involve significant effects on the environment. But whether a project should be categorically exempt from CEQA is different from whether the project involves a significant effect on the environment. The finding that an exception to exemption applies ensures an initial study to investigate *whether* there is a potential significant effect on the environment but does not establish that such an effect exists. (See *Davidon Homes*, *supra*, 54 Cal.App.4th at p. 113.) As the City points out, a site may stay on the Cortese list even after a determination is made that no further remediation is required, and this is precisely what occurred in this case. In short, we are

12

not persuaded that projects built on sites identified on the Cortese list necessarily involve a significant effect on the environment.[7]

> 2. The identified health risks to construction workers and future residents do not establish that the disturbance of contaminated soil may have a significant effect on the environment.

We next turn to whether the project will have a significant effect on the environment as a result of the potential health risks to people. We conclude that the health risks to workers and residents identified by petitioners do not constitute "substantial adverse effects on human beings" or otherwise create a fair argument that the disturbance of contaminated soil may have a significant effect on the environment.

To begin with, and while we need not and do not decide the issue here, we note that it is far from clear that adverse effects confined only to the people who build or reside in a project can ever suffice to render significant the effects of a physical change. In general, CEQA does not regulate environmental changes that do not affect the public at large: "the question is whether a project [would] affect the environment of persons in general, not whether a project [would] affect particular persons."[8] (*Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 492; accord *Martin v. City and County of San Francisco* (2005) 135 Cal.App.4th 392, 404.)

---

[7] A pre-AB 869 case cited by Parker Shattuck, *McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136, also dealt with the exemption issue instead of the significant-effect issue. The court observed that a project on a hazardous-waste site should not be exempted from CEQA review given the possibility "that the storage, use, or disposal of [hazardous waste] may . . . eventually cause an adverse change in the physical conditions of the affected area." (*Id.* at p. 1149.) Thus, like *CREED, supra*, 197 Cal.App.4th 327, the decision assumed that the contamination would cause a physical change.

[8] At oral argument, counsel for petitioners argued that CEQA covers environmental effects on a project's workers and future residents because these groups are made up of people who are part of the public. Although we doubt that CEQA regulates environmental effects confined to such relatively small groups, we note that these groups are not unprotected from risks when a project is built on a potentially contaminated site. (See, e.g., Health & Saf. Code, § 25220 et seq. [regulating building on hazardous-waste sites]; Lab. Code, § 6300 et seq. [regulating workplace safety].)

13

For example, in *Topanga Beach Renters Assn. v. Department of General Services* (1976) 58 Cal.App.3d 188, the plaintiff argued that the demolition of living structures on a beach would adversely affect humans, and thus constitute a significant effect on the environment requiring an EIR, because "the planned demolition [would] evict people from their homes (with consequent adverse effect on those people)." (*Id.* at pp. 191, 194.) The court held that the "[a]dverse effect on persons evicted from Topanga Beach cannot alone invoke the requirements of CEQA, for all government activity has some direct or indirect adverse effect on some persons." (*Id.* at p. 195.) "The issue [was] not whether demolition of structures [would] adversely affect particular persons but whether demolition of structures [would] adversely affect the environment of persons in general." (*Ibid.*) In short, the court concluded that there was no significant effect on the environment because the identified impact affected only a particular group of people.

We find it significant that in the case before us the only people identified by Parker Shattuck who potentially will be impacted by the project are those who will work on or live at the project site. In *Long Beach*, the court considered the argument that an EIR addressing the proposed construction of a high school to serve over 1,800 students was insufficient because it failed to discuss the project's "cumulative impacts on air quality and traffic 'and in turn, on staff and student health' " in light of already-existing emissions from nearby freeways.[9] (*Long Beach*, *supra*, 176 Cal.App.4th at pp. 895, 905.) The court observed that "generally, '[t]he purpose of an [EIR] is to identify the significant effects on the environment of a project . . .' [citations], not the impact of the environment on the project, such as the school's students and staff." (*Id.* at p. 905, italics omitted.) As a result, the air quality's effect on staff and student health was "not the aim of the cumulative impacts analysis," and the court did not consider the EIR's failure to discuss health risks germane to the cumulative impacts issue. (*Id.* at pp. 905-912.) *Long*

_____

[9] Cumulative impact analysis addresses " 'whether the additional impact associated with [a] project should be considered significant in light of the serious nature of existing [environmental] problems' " caused by already-existing projects. (*Long Beach*, *supra*, 176 Cal.App.4th at pp. 905-906, italics omitted.)

14

*Beach* instructs that a physical change caused by a project, even one affecting several hundred people, is not necessarily cognizable under CEQA when the people affected are part of the project. (See also *Ballona*, *supra*, 201 Cal.App.4th at pp. 473-474 ["identifying the effects on the project *and its users* of locating the project in a particular environmental setting is neither consistent with CEQA's legislative purpose nor required by the CEQA statutes," italics added].)

We recognize that when a project may cause a physical change to the environment, CEQA requires a consideration whether the change will have a potential impact on people. This is the import of section 21083, subdivision (b)(3)'s requirement that an environmental effect be deemed significant if it will have an adverse effect on people. In addition, if the environmental changes are deemed significant, then an EIR must discuss "health and safety problems caused by the physical changes." (Guidelines, § 15126.2, subd. (a).) None of the authorities cited by Parker Shattuck, however, holds that a significant effect on the environment must be found when potential health risks are confined to people associated with a project. (See *Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 316-317, 320, 327 [EIR required for petroleum refinery's production of ultralow sulfur diesel fuel where project would greatly increase the emission of nitrogen oxide, which is "a major contributor to smog formation and can cause adverse health effects, especially aggravation of respiratory disease"]; *City of Maywood v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362, 371, 375, 403-405 [EIR discussed potential risks to health of school's students and employees to comply with Education Code requirements and after initial study's finding of no potential significant environmental effects from hazardous-material contamination]; *Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 81-82, 89 [EIR inadequately addressed whether refinery upgrade would result in processing of heavier crude oil and therefore failed to address potential impacts of such processing, including health risks to members of surrounding community]; *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1219-1220 [relying on Guidelines, section 15126.2,

subdivision (a) to hold that EIR was inadequate because it failed to discuss adverse health effects of increased air pollution]; *ACE*, *supra*, 116 Cal.App.4th 629 [no discussion of impacts on human health]; *Berkeley Keep Jets Over the Bay Com. v. Board of Port Comrs.* (2001) 91 Cal.App.4th 1344, 1350, 1352, 1364 [where EIR for airport expansion acknowledged significant effects on air quality, EIR was inadequate because it failed to include assessment of increased air pollution's risk to people living near airport].)

We also reject Parker Shattuck's argument that CEQA requires consideration of the potential impact Parker Shattuck has identified simply because the MND mentioned a consideration of "the [p]roject's impacts on the public and construction workers" after a box was checked on a form checklist indicating that the site was on the Cortese list. The form checklist comes from Appendix G of the Guidelines, which provides a suggested list of potentially significant impacts to be considered when preparing an initial study. We do not believe the MND establishes that the City conceded that CEQA required consideration of health risks limited to workers and future residents. Furthermore, even if the MND's consideration of a potential factor on a form checklist could be construed as some sort of admission, the admission would not offset the weight of authority indicating that an EIR is not required for environmental effects that impact only a limited group of people. (See *SOCWA*, *supra*, 196 Cal.App.4th at p. 1616 ["A few questions on a suggested checklist in an appendix to the [G]uidelines do not seem to us to provide a strong enough foundation on which to base a reversal of the entire purpose of CEQA"].)

Ultimately, and notwithstanding the parties' extensive briefing on the issue, we need not decide whether the potential effects of a physical change that poses risk only to the people who will construct and reside in a project may ever be deemed significant. (See *California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2013) 218 Cal.App.4th 1171, 1195 [declining to "decide whether *Baird*, *Long Beach*, *SOCWA*, and *Ballona* were correctly decided or whether, as a general rule, an EIR may be required solely because the existing environment may adversely affect future occupants of a project"].) This is because the evidence Parker Shattuck has identified does not support a fair argument of significance even if health risks to a project's workers

16

and future residents alone could establish that a physical change would have a significant effect on the environment.

Parker Shattuck relies on Hagemann's comments in support of its argument that disturbing the contaminated soil will have a significant environmental effect due to the health risk the site's contamination poses to workers and future residents.[10] His conclusions were based on the levels at the site of 1,2-dichloroethane and benzene, both VOCs, and of total petroleum hydrocarbons.[11]

1,2-dichloroethane, a potential human carcinogen, was present in one groundwater sample from 2600 Shattuck Avenue at the level of 14 ug/L (micrograms/liter). Hagemann stated that the safe level of this compound in drinking water is .5 ug/L, the Regional Board recommends a vapor-intrusion study when the level exceeds .5 ug/L, and the United States Environmental Protection Agency recommends such a study when the level exceeds 5 ug/L.[12] Benzene, a known human carcinogen, was present in one groundwater sample from 2600 Shattuck Avenue at 9.3 ug/L. Hageman stated that the safe level of this compound in drinking water is 1 ug/L, the Regional Board recommends a vapor-intrusion study when the level exceeds 1 ug/L, and the United States Environmental Protection Agency recommends such a study when the level exceeds 5 ug/L. Finally, total petroleum hydrocarbons were found in the soil at one boring at

---

[10] Parker Shattuck also refers to EBMUD's letter, but it does not support a fair argument of a significant environmental effect. Rather, it merely states that should the soil and groundwater be contaminated at unspecified levels, EBMUD will not work at the site.

[11] Parker Shattuck also mentions the Phase I report's statement that polychlorinated biphenyls (PCBs) might be present because hydraulic lifts were observed at the site. Hagemann's comments do not mention PCBs or any health risks they may pose, and Parker Shattuck has not identified any evidence that the presence of PCBs is more than a "speculative possibilit[y]." (*Citizen Action to Serve All Students v. Thornley* (1990) 222 Cal.App.3d 748, 756.) Indeed, during Phase II several soil samples were tested for PCBs, and no such contamination was found.

[12] In his discussion of 1,2-dichloroethane, Hagemann sometimes refers to benzene, but we assume he meant the former compound.

17

2600 Shattuck Avenue at a level of 1900 mg/kg (milligrams/kilogram), which exceeds the Regional Board screening level for industrial/commercial use of 1000 mg/kg.

Hagemann contended that future residents are at risk because vapors from the two VOCs may travel through the soil into buildings constructed on the site through a process known as vapor intrusion and thereby expose these buildings' residents to polluted air.[13] Based on the levels of the two VOCs, Hagemann suggested that a vapor-intrusion study be performed. This opinion is insufficient to create a fair argument of a significant effect on the environment because a suggestion to investigate further is not evidence, much less substantial evidence, of an adverse impact.[14]

Hagemann also contended that construction workers may be exposed to the VOCs by inhaling their vapors and to the VOCs and hydrocarbons through dermal contact. Even assuming that the disturbance of contaminated soil would cause these risks, we conclude Hagemann's contention still fails to amount to substantial evidence supporting a fair argument of a significant effect on the environment. First, while the levels of the two VOCs exceed screening levels for drinking water and, according to Hagemann, suggested the need for a vapor-intrusion study, the levels do not exceed Regional Board levels for nonpotable water. Hagemann provided no explanation why levels below the Regional Board screening levels might pose health risks where the water will not be drunk. Second, Hagemann did not discuss the significance for human health of exposure to petroleum hydrocarbons or challenge the Phase II supplemental report's finding that the

---

[13] Hagemann also challenged the conclusion of the City's Toxic Management Division, to which the Regional Board deferred, that the Cortese-list case closure combined with mitigation measures established the site would be safe for residential, not just commercial, use. The issue of whether the Toxic Management Division rightly relied on the case closure to establish the site's safety for residential use does not bear on our decision because Hagemann's comments are not sufficient evidence that the health of future residents may be at risk.

[14] Our conclusion that Hagemann's call for a vapor-intrusion study is not substantial evidence creating a fair argument of a significant effect on the environment is bolstered by the uncontroverted evidence that 26,000 cubic yards of soil will be excavated from 2600 Shattuck Avenue before construction and that underground parking and the ground floor will separate residential units from any vapor-intrusion pathway.

contamination from the hydrocarbons is not the type that would usually "require cleanup." Instead, he simply claimed that the level of total petroleum hydrocarbons should lead to further investigation.

We conclude that, even if health risks confined to a project's construction workers and future residents could ever trigger CEQA review, substantial evidence was not identified in the record to create a fair argument that the disturbance of contaminated soil may have a significant effect on the environment.

### III.
#### DISPOSITION

The judgment is affirmed. Respondents are awarded their costs on appeal.

_____
Humes, J.

We concur:

_____
Reardon, Acting P.J.

_____
Rivera, J.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PARKER SHATTUCK NEIGHBORS et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>BERKELEY CITY COUNCIL et al.,<br><br>    Defendants and Respondents;<br><br>CITYCENTRIC INVESTMENTS, LLC et al.,<br><br>    Real Parties in Interest and<br>    Respondents. | A136873<br><br>(Alameda County<br>Super. Ct. No. RG12617535)<br><br> ORDER RE PUBLICATION |

The written opinion which was filed on November 7, 2013, has now been certified for publication pursuant to rule 8.1105(b) of the California Rules of Court, and it is ordered published in the official reports.

Trial Court:                      Alameda County Superior Court

Trial Judge:                    Honorable Evelio M. Grillo

Counsel for Appellant:         Christina M. Caro, Lozeau Drury, Richard Toshiyuki Drury

Counsel for Defendant and Respondent Berkeley City Council:         Laura Nicole McKinney, Office of City Attorney

Counsel for Real Party in Interest and Respondent CityCentric Investments LLC:         Andrew Biel Sabey, Cox Castle & Nicholson