Filed 12/11/20  Citizens for Smart Development etc. v. County of Amador CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Amador)

----

| | |
|---|---|
| CITIZENS FOR SMART DEVELOPMENT IN AMADOR COUNTY,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>COUNTY OF AMADOR,<br><br>Defendant and Respondent. | C082915<br><br>(Super. Ct. No. 15CVC0374) |

To address jail overcrowding, the County of Amador (the County) proposes to expand its existing jail to add 40 additional inmate beds, space for inmate education, and other supportive facilities.  As part of the planning process for this project, the County completed an initial study to determine the project's potential environmental impacts, as is required under the California Environmental Quality Act (CEQA; Pub. Resources

1

Code, § 21000 et seq.).[1]  Following the study, and after hearing public comments, the County found the proposed expansion would have no significant impacts if certain mitigation measures were implemented.  It thus prepared a mitigated negative declaration for the project.

Citizens for Smart Development in Amador County (Citizens) brought this action in response.  In their view, the County failed to sufficiently evaluate the project's aesthetic and hydrology impacts, wrongly deferred the specifics of certain mitigation measures, wrongly found the project's mitigation measures would adequately reduce project impacts, and failed to certify that the mitigated negative declaration reflected the County's independent judgment.  The trial court disagreed with each of their claims, and we do too.  We thus affirm.

BACKGROUND

The County's current jail was constructed in 1984 and has beds for 76 inmates.  But in recent years, it has housed far more than these beds can sleep.  In 2014, for example, the jail housed an average of over 91 inmates.

To address overcrowding, in 2008, the County applied for and obtained a conditional grant from the state to finance a new jail that could house a larger inmate population.  But the County ultimately was unable to move forward with the planned new facility, in part because of difficulties in deciding where to site the jail and in part because of funding issues.  After these plans fell through, the County considered in 2014 a cheaper alternative to a new facility:  An expansion of its existing jail facility.  That is the project before us.

The County's proposed jail expansion involves the construction of an 8,000 to 10,000 square foot space adjacent to the existing jail that would include, among other

---

[1]  Further undesignated statutory references are to the Public Resources Code.

2

things, 40 new inmate beds and space for exercise, educational programs, and segregating inmates. It would also include new walkways and a new parking lot with about 20 spaces.

In late 2014, the County initiated CEQA review for the project. To that end, the County completed a ground penetrating radar survey, a biological resources assessment, and a geotechnical investigation for the proposed project. In part based on these studies, the County found that "although the proposed project could have a significant effect on the environment, there will not be a significant effect in this case because revisions in the project have been made by or agreed to by the project proponent." It afterward sought comments from the public about the project.

In response to the proposed expansion, several residents living near the jail expressed concerns about the project's potential environmental impacts. In particular, as relevant here, these residents contended the project would infringe on one resident's privacy, shade another's property, potentially have bothersome lighting, and lead to increased stormwater runoff.

But in the end, the County continued to find the jail expansion would "not have a significant adverse effect on the environment due to mitigation measures incorporated into and required of the project." It thus adopted a mitigated negative declaration (MND) for the project on July 20, 2015, and issued a notice of determination about its findings that same day.

Citizens afterward filed a petition for writ of mandate challenging the County's approval of the project, raising, in the trial court's view, four issues: "(1) the MND is inadequate in impacts analyses regarding aesthetics; (2) the MND is inadequate in impacts analyses regarding hydrological impacts; (3) the Project will create a mandatory finding of significance; and (4) the County failed to make a required CEQA finding." But the trial court found none of Citizens's claims warranted granting their petition. It thus denied their petition. Citizens timely appealed.

DISCUSSION

I

CEQA Background

We start with a little background on the purpose and structure of CEQA.  CEQA serves "to ensure that public agencies will consider the environmental consequences of discretionary projects they propose to carry out or approve."  (*Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, 488.)  To that end, an agency proposing to carry out or approve a project generally must conduct an initial study to determine "if the project may have a significant effect on the environment."  (Cal. Code. Regs., tit. 14, § 15063, subd. (a).)

Depending on the initial study's findings, the agency must then prepare either an environmental impact report (EIR) or a negative declaration.  If "there is no substantial evidence that the project or any of its aspects may cause a significant effect on the environment," the agency need only prepare a negative declaration that "briefly describ[es] the reasons that a proposed project . . . will not have a significant effect on the environment."  (Cal. Code. Regs., tit. 14, §§ 15063, subd. (b)(2), 15371.)  But if substantial evidence shows the project may in fact have a significant environmental effect, then the agency generally must prepare an EIR providing detailed information about the project's potential environmental impacts.  (§§ 21100 [state agency requirements], 21151 [local agency requirements], 21061 [defining an EIR].)  But not always.  Rather than prepare an EIR under these circumstances, "[t]he public agency may instead prepare a mitigated negative declaration (MND) if '(1) revisions in the project plans . . . before the proposed negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur, and (2) there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment.'  (Pub. Resources Code, § 21064.5.)"

4

(*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 945.)

In reviewing an agency's compliance with CEQA, courts review for abuse of discretion. (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1112.) Courts will find an agency abused its discretion if it either failed to proceed in a manner required by law or reached a decision not supported by substantial evidence. (*Id.* at p. 1110.) Although the "substantial evidence" standard is often viewed as a highly deferential one, it is less so in cases involving challenges to an agency's decision to prepare a negative declaration rather than an EIR. In those types of cases, like ours, courts apply what is known as the "fair argument" test. Under that test, courts will find an agency's decision is not supported by substantial evidence if a challenging party has raised a "fair argument," based on substantial evidence in the record, that a proposed project may have a significant environmental effect. (See *Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.*, *supra*, 1 Cal.5th at p. 957.) With that background, we turn to Citizens's arguments.

II

The County's Review of the Project's Potential Environmental Impacts

A. *Aesthetic Impacts*

Citizens first take issue with the County's review of aesthetic impacts. First, they assert that the project will have significant unmitigated impacts concerning "privacy and sunlight blockage." In our view, however, they never raise a "fair argument" that these alleged impacts could be significant. In terms of privacy, Citizens note that one resident alleged that certain parts of the project would look down onto his property. That same resident then later asserted the project would shade another landowner's property during the winter. But this limited evidence about the potential impacts to two properties is not substantial evidence raising a fair argument that the project may have a significant impact on the environment. (See *Parker Shattuck Neighbors v. Berkeley City Council* (2013)

5

222 Cal.App.4th 768, 782 (*Parker Shattuck Neighbors*) ["In general, CEQA does not regulate environmental changes that do not affect the public at large."]; *Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 243 [" ' "Under CEQA, the question is whether a project will affect the environment of persons in general, not whether a project will affect particular persons." ' "]; *Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572, 586 (*Bowman*) ["obstruction of a few private views in a project's immediate vicinity is not generally regarded as a significant environmental impact"].)[2]

Citizens next allege the project will have significant lighting impacts. They note that one resident testified that new " 'lighting might . . . produce glare' " for some properties, and another similarly testified that new lighting " 'might glare in through the windows' " of some neighboring properties. But these speculative comments standing alone fall well short of showing the project's lighting impacts could be significant. (See § 21080, subd. (e)(2) ["[s]ubstantial evidence is not . . . speculation"].) These comments also appear to ignore the County's mitigation measure to address lighting impacts. In the MND, the County found impacts caused by exterior security lighting for the project would be reduced to less than significant by using lighting "of a type and style (shielded and downward directed) so as to minimize light bleed and glare onto adjacent properties." Although Citizens express concerns about potential glare, they never explain in their opening brief why this mitigation measure would fail to address their concerns. We thus have no reason to find the County's mitigation measure inadequate.[3]

_____

**2** The County contends we should also reject Citizens's privacy claim for another reason: An impact to an individual's privacy is not an aesthetic impact. But because we reject Citizens's argument for another reason, we need not consider this alternative argument.

**3** In their reply brief, Citizens briefly explain why they believe this mitigation measure is inadequate. But because they raise this argument for the first time in their

6

Finally, Citizens contend one of the County's mitigation measures wrongly defers the specifics of mitigation. In the MND, the County found impacts to "the existing visual character or quality of the site and its surroundings" would be reduced to less than significant by submitting project plans "to the City of Jackson for design review and comment." According to Citizens, this "design review after the fact (after project approval by the County) does not count as CEQA compliance prior to project approval, as is required." We reject the claim.

To begin, courts have rejected similar arguments concerning the use of design review. Take *Bowman*, *supra*, 122 Cal.App.4th 572. The lead agency there found a housing complex, with retail on the ground floor, "would not '[s]ubstantially degrade the existing visual character or quality of the site and its surroundings' . . . in part because '[c]onstruction of this project is subject to design review and approval prior to issuance of building permits.' " (*Id.* at p. 593.) Several individuals and an association later challenged this conclusion, contending, among other things, that the project would be "out of character with its surroundings" and thus cause significant aesthetic impacts. (*Id.* at p. 587.) But the court rejected the challenge based on two principal considerations. First, the court found it significant that the project would be located in an area that was already highly developed. Quoting the regulations implementing CEQA, the court explained that " 'the significance of an activity may vary with the setting. For example, an activity which may not be significant in an urban area may be significant in a rural area.' [Citations.]" (*Id.* at p. 589.) The court then concluded that it "d[id] not believe that our Legislature in enacting CEQA . . . intended to require an EIR where the sole environmental impact is the aesthetic merit of a building in a highly developed area." (*Id.* at p. 592.) Second, the court found it significant that the project was subject to

reply brief, without good cause, we will not consider it. (See *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8.)

design review before the issuance of building permits.  According to the court, "[w]here a project must undergo design review under local law, that process itself can be found to mitigate purely aesthetic impacts to insignificance, even if some people are dissatisfied with the outcome." (*Id.* at p. 594.)  "A contrary holding that mandated redundant analysis," the court added, "would only produce needless delay and expense." (*Ibid.*)

*Bowman*'s reasoning, if applied here, would appear to weigh heavily in the County's favor.  But even if we found *Bowman* distinguishable, as Citizens maintain, we would still reject their argument.  Although Citizens contend the County's design-review measure is flawed, they never raise a fair argument that the project could have unmitigated significant impacts as a result.  They maintain, as discussed, that the project could have significant aesthetic impacts based on lighting, privacy, and sunlight issues; but again, we find none of these contentions persuasive.  And so, even assuming the design-review measure would do nothing, Citizens still would have failed to raise a fair argument that the project's aesthetic impacts could be significant.  We thus reject their contention that the challenged measure may insufficiently mitigate the project's potential aesthetic impacts.  (See *Parker Shattuck Neighbors*, *supra*, 222 Cal.App.4th at p. 778 [a court "need not consider" a party's challenge to a negative declaration's mitigation measures unless that party first identifies substantial evidence supporting a fair argument that the project could have a significant impact]; 1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2019) § 6.78C ["A reviewing court need not consider whether mitigation measures in a negative declaration are adequate if the petitioner fails to identify substantial evidence supporting a fair argument that the project's impacts would be significant in the absence of mitigation."].)

B.    *Hydrological Impacts*

Citizens next challenge the County's analysis of hydrological impacts.  First, expressing concern that the project will increase runoff to neighboring properties, Citizens fault the County for not studying the project's potential impacts from increased

8

runoff "with expert analysis in the form of a hydrology study." But the County did obtain an expert report, albeit a very brief one, from an engineering firm, which discussed runoff and other project issues. That report, for example, acknowledged potential runoff issues and recommended that "[s]pecial care . . . be taken to ensure adequate drainage is provided throughout the life of the structure." The County, in light of this report and other considerations, agreed "to ensure that all runoff from the project site will not exceed the pre-project flow rates." It also agreed to design the project "consistent with local requirements," which impose similar limitations on runoff. Under Jackson City Municipal Code, for example, "[t]he net rate release of runoff from a site onto adjoining parcels and rights-of-way after construction shall not be greater than pre-construction levels of the runoff release from the site based on a 20-year, one-hour storm event." (Jackson Mun. Code, § 17.30.050(D).)

Citizens might have preferred a more in-depth study about runoff, and, in some circumstances, we might have agreed that a more detailed study would have been better. But here, given the County's commitment to ensure the project did not increase runoff rates, we are not persuaded that the County needed to undertake a more detailed study about the potential impacts from increased runoff rates. In any event, even if a more in-depth study would have been helpful, a lack of study " 'on a particular issue does not automatically invalidate a negative declaration.' " (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1379.) Although it may " 'enlarge the scope' of the fair argument which may be made 'based on the limited facts in the record,' " a "lack of study, standing alone, does not give rise to a fair argument that [a] [p]roject will in fact have significant . . . effects. [Citation.]" (*Id.* at p. 1382; see also *Parker Shattuck Neighbors*, *supra*, 222 Cal.App.4th at p. 786 ["a suggestion to investigate further is not evidence, much less substantial evidence, of an adverse impact"].)

Citizens next contend the County's mitigation measures to address runoff impacts wrongly defer the specifics of mitigation. To address runoff related issues, the County,

among other things, agreed to develop drainage plans "to assess drainage patterns, potential erosion and downstream flooding impacts" before final project design. The County further agreed that "[t]he final project design will be consistent with local requirements and include design features to ensure that all runoff from the project site will not exceed the pre-project flow rates." According to Citizens, these measures "are vague, unenforceable, improperly defer to future mitigation, and are otherwise inadequate." We disagree.

Citizens's objection is similar to one our court rejected in *Friends of Oroville v. City of Oroville* (2013) 219 Cal.App.4th 832 (*Friends of Oroville*). The lead agency there, for one of its mitigation measures, required the project applicant to "submit for the [lead agency's] approval a drainage plan 'that will ensure that runoff from the [P]roject site is released at a rate no greater than that of the pre-development condition.' " (*Id.* at p. 838.) Several plaintiffs later challenged the mitigation measure, alleging it "improperly defer[red] formulation of specific mitigation strategies until after the Project's approval." (*Ibid.*) But we rejected the challenge. We noted that "[d]eferral of mitigation specifics is permissible where the relevant agency commits itself to mitigation and articulates specific performance criteria or standards that must be met for the project to proceed." (*Ibid.*) We then found the agency's measure "compl[ied] with this principle," reasoning that it articulated a specific performance standard—namely, no increase in the rate of runoff—to mitigate potential drainage impacts. (*Ibid.*)

We find likewise here. As in *Friends of Oroville*, the County identified a potential problem (a potential increase in runoff) and committed to a specific performance standard to address that problem (no increase in the rate of runoff). Although the County has yet to identify the particular means to achieve that objective, other than that it will involve the use of underground cisterns, the County's mitigation measure is not unlawful for that reason. (See *Friends of Oroville*, *supra*, 219 Cal.App.4th at p. 838; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 418 [lead

10

agency satisfied CEQA when it committed to limit noise from a project's ventilation fans to a certain level, even though the fans had yet to be selected and specific noise control treatments had yet to be evaluated]; *Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1274-1276 [lead agency satisfied CEQA when it "committed to mitigation, and . . . specified the criteria to be met," even though the details of mitigation would depend on future study].)

      C.     *Hazardous Emissions or Materials*

Citizens also challenge the County's mitigation measures concerning potential impacts from hazardous emissions and materials. In their view, the County wrongly defers the specifics of mitigation related to these impacts.

But Citizens never acknowledge that the trial court found this claim "waived and/or barred." The trial court evaluated only those claims "raised in the Petition and substantively briefed by [Citizens] in [their] opening brief," finding all other arguments—including Citizens's argument here—"waived and/or barred." Because Citizens declined to challenge this aspect of the court's decision, we have no reason to find it flawed. (See *Center for Biological Diversity v. California Department of Conservation* (2019) 36 Cal.App.5th 210, 226 [" ' " '[i]ssues not raised in an appellant's brief are deemed waived or abandoned' " ' "].) We thus will not disturb the court's unchallenged finding that Citizens's claim here was "waived and/or barred."

      D.     *Mandatory Findings of Significance*

Lastly, in terms of the County's evaluation of project impacts, Citizens take issue with the County's consideration of certain "mandatory findings of significance."

The whole of Citizens's argument consists of a single paragraph: "[T]he Mitigated Negative Declaration itself concluded that the project would create a Mandatory Finding of Significance but provides no explanation nor mitigation measure. [Citation.] The problem is that the box stating the impact would be reduced to significance with mitigation measure is checked [citation], but no mitigation measures

11

were identified. There is substantial evidence in the record that the project will cause substantial adverse effects on human beings, either directly or indirectly. That evidence is set forth above in section IV.B.1.a. [Citation.] Thus, the impact remains significant and unmitigated so a Negative declaration is not substantiated."

Citizens's argument suffers from several significant flaws. To start, their argument is premised in part on a cross-referenced section, section IV.B.1.a., that does not exist. But even more problematic, no part of Citizens's argument was presented at the administrative level. Parties challenging an agency's negative declaration or EIR under CEQA must show "the alleged grounds for noncompliance . . . were presented to the public agency orally or in writing . . . ." (§ 21177, subd. (a).) But Citizens never made that showing here. For that reason, the County asserted that Citizens's claims relating to "Mandatory Findings of Significance . . . [are] barred and may not be litigated." We agree. (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 615 [" ' "Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action." ' "].)

### III

### The County's Independent Judgment and Analysis

Finally, we consider Citizens's contention that the County failed to "make a finding that the mitigated negative declaration reflects the agency's independent judgment and analysis." (See § 21082.1, subd. (c)(3) [a lead agency must, "[a]s part of the adoption of a negative declaration or a mitigated negative declaration, or certification of an environmental impact report, find that the report or declaration reflects the independent judgment of the lead agency"].)

The trial court rejected this argument on the ground that Citizens "failed to administratively exhaust this issue." The court reasoned that Citizens never commented about this shortcoming during the administrative proceedings, even though they had ample opportunity to do so. (See § 21177, subd. (a) [a party challenging an agency's

MND under CEQA must show "the alleged grounds for noncompliance . . . were presented to the public agency orally or in writing . . . ."].)

In their opening brief on appeal, however, Citizens never allege the trial court erred in this regard. We thus have no reason to depart from the trial court's finding that Citizens forfeited their claim here by "fail[ing] to administratively exhaust this issue." (See *Center for Biological Diversity v. California Department of Conservation*, *supra*, 36 Cal.App.5th at p. 226 [" ' " '[i]ssues not raised in an appellant's brief are deemed waived or abandoned' " ' "].)[4]

DISPOSITION

The judgment is affirmed. The County is entitled to recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a).)


/s/<br>BLEASE, Acting P. J.



We concur:



/s/
HULL, J.



/s/
MURRAY, J.

---

[4] In their reply brief, Citizens argue for the first time that the trial court wrongly found they failed to exhaust their administrative remedies. But because they raise this argument for the first time in their reply brief, without good cause, we will not consider it. (See *Neighbours v. Buzz Oates Enterprises*, *supra*, 217 Cal.App.3d at p. 335, fn. 8.)

13