[No. D057779. Fourth Dist., Div. One. June 10, 2011.]

CITIZENS FOR RESPONSIBLE EQUITABLE ENVIRONMENTAL DEVELOPMENT, Petitioner and Appellant, v. CITY OF CHULA VISTA, Respondent; TARGET CORPORATION, Real Party in Interest.

### COUNSEL

Briggs Law Corporation, Cory J. Briggs and Mekaela M. Gladden for Petitioner and Appellant.

Bart J. Miesfeld, City Attorney, and Michael J. Shirey, Deputy City Attorney; Gatzke Dillon & Ballance, Mark J. Dillon and Rachel C. Cook for Respondent.

Holland & Knight, Amanda J. Monchamp and Shannon K. Little for Real Party in Interest.

### OPINION

**McINTYRE, J.**—Following preparation of an initial study under the California Environmental Quality Act (CEQA; Pub. Resources Code, §§ 21000–21178.1; undesignated statutory references are to this code), the City of Chula Vista (City) adopted a mitigated negative declaration (MND) with respect to a project to replace a store operated by Target Corporation (Target), a smog check facility, and a small market (the existing facilities) with a new larger Target store (the Project). Citizens for Responsible Equitable Environmental Development (Citizens) filed a petition for writ of mandate in the trial court against the City. Citizens appeals from the denial of the petition.

Citizens contends the trial court erred because there is substantial evidence of a fair argument that the Project may have a significant environmental impact on hazards or hazardous materials; air quality for sensitive receptors; particulate matter and ozone; and greenhouse gas emissions and global climate change.

We conclude that the judgment denying Citizens's petition for a writ of mandate must be reversed to the extent it concluded that Citizens had not presented a fair argument that hazards and hazardous materials from the Project may create a potentially significant adverse environmental impact. In all other respects, the judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

The Project site is a 9.9-acre shopping center parcel at the northwestern corner of North Fourth Avenue and C Street in City. The Project proposes to demolish the existing facilities and replace them with a new Target store, resulting in a net size increase of 9,844 square feet of commercial development. The Project would increase the site's green space from 3.17 percent to 10.6 percent, and provide drainage facility improvements.

In November 2008, Target applied for the Project's preliminary environmental review. In January 2009, the City circulated its initial study which determined that the Project may cause potentially significant impacts and required Target to comply with a series of mitigation measures set forth in the MND and an associated mitigation monitoring and reporting program (monitoring program). The City received no comments during the public review period. The MND concluded that the Project could have significant environmental impacts in the areas of air quality, geology and soils, hazards and hazardous material, hydrology and water quality, and traffic/transportation, but that those impacts could be mitigated. In June 2009, the City's planning commission recommended that the city council approve the Project.

On July 13, 2009, the day before the city council meeting, Citizens submitted a letter along with a CD-ROM containing thousands of pages of materials, asking that the council deny the Project. The following day, the City responded to each of the concerns raised by Citizens. After receiving no oral comments at the meeting, the city council voted to approve the MND, monitoring program, and amend the zoning map. Citizens filed this action challenging the City's approval of the Project without preparing an environmental impact report (EIR).

The trial court issued a tentative ruling denying the petition for writ of mandate, and the parties submitted to the ruling. The court filed a judgment, and Citizens timely appealed.

## DISCUSSION

### I.  *Standard of Review*

An EIR must be prepared "whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental

impact." (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 75 [118 Cal.Rptr. 34, 529 P.2d 66] (*No Oil*).) Under the fair argument standard, we determine whether there is substantial evidence in the record to support a fair argument that the project may have a significant effect on the environment. (Cal. Code Regs., tit. 14, § 15064, subd. (f)(1).) (References to the "Guidelines" refer to the CEQA Guidelines, Cal. Code Regs., tit. 14, ch. 3.) Whether a fair argument exists is a question of law that we review de novo, with a preference for resolving doubts in favor of environmental review. (*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 928 [21 Cal.Rptr.3d 791].) Although our review is de novo and nondeferential, we must give the lead agency the benefit of the doubt on any legitimate, disputed issues of credibility. (*Ibid.*)

Under the fair argument standard, a project "may" have a significant effect whenever there is a "reasonable possibility" that a significant effect will occur. (*No Oil, supra,* 13 Cal.3d at pp. 83–84.) Substantial evidence, for purposes of the fair argument standard, includes "fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact." (§ 21080, subd. (e)(1).) Substantial evidence is not argument, speculation, unsubstantiated opinion or narrative, evidence that is clearly inaccurate or erroneous, or evidence of social or economic impacts unrelated to physical impacts on the environment. (§ 21080, subd. (e)(2).)

## II.  *Hazards and Hazardous Materials*

Citizens asserts the record contains substantial evidence of a fair argument that the Project may have a significant environmental impact due to contaminated soil, and the evidence does not show that the potential impact will be mitigated to a level of insignificance. We agree.

The MND notes that a gas station, formerly operating on a portion of the Project site, created environmental contamination "beneath the site" from leaking underground storage tanks and product lines. Since 1990, the groundwater at the site has been monitored. In 1996, "[c]onfirmatory soil sampling" was conducted. In 2008, a corrective action plan was created to reduce the remaining methyl tertiary butyl ether on the property. The Project's monitoring program indicates that the mitigation measures outlined in the corrective action plan must be complied with before building permits are issued. The MND anticipated that the required remediation would be completed before grading started, and if not completed, would continue during the grading activities.

The City asserts that the building permit stage is an acceptable deadline for completion of the remediation activities because it is groundwater that is

contaminated and not soils and existing groundwater contamination will not be affected by grading activities. The record, however, suggests otherwise.

The Guidelines define "substantial evidence" as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).) Here, the MND suggests that pollutants leaking from underground storage tanks contaminated the soil underneath the Project site before reaching the groundwater. Although the building permits are conditioned on compliance with the corrective action plan, it is unknown what, if any, mitigation measures in this plan address contaminated soils as the corrective action plan is not part of the record. Thus, it can be fairly argued that the Project may have a significant environmental impact by disturbing contaminated soils.

Accordingly, the matter must be remanded to the trial court to determine whether the corrective action plan addresses contaminated soil. In the event the trial court determines that the corrective plan does not address contaminated soil, it is to order an EIR.

### III. *Air Pollution Impact on Sensitive Receptors*

"Sensitive receptors" include children. Citizens contends that there are at least four schools and preschools within a mile of the Project, and that the nearest residence is within 500 feet of the Project; however, the MND does not mention sensitive receptors and merely identifies mitigation measures designed to reduce dust and exhaust emissions. It asserts that the Project will emit hazardous air pollutants, particularly diesel exhaust, during construction and normal operations, and that the emission of these pollutants warranted a health-risk assessment or, at a minimum, a health-risk screening. Because there is no analysis of the environmental impact of these pollutants, Citizens claims it is impossible to tell if the mitigation measures identified in the MND will be effective at reducing the sensitive-receptor impact to a level of insignificance. Thus, it concludes there is substantial evidence of a fair argument that the Project may have a significant impact by exposing sensitive receptors to increased air pollution. We disagree.

An "Air Quality Assessment" prepared for the Project analyzed potential air quality impacts caused by construction and operation of the Project. The Air Quality Assessment states that a project would have a significant environmental impact if it would expose sensitive receptors, such as children or the elderly, to substantial pollutant concentrations. As required by the Guidelines, the Air Quality Assessment evaluated, among other things, whether the Project would expose sensitive receptors to substantial pollutant concentrations.

To determine whether the Project would produce emissions that could violate any air quality standard or contribute substantially to an existing or projected air quality violation, the City was guided by the CEQA Air Quality Handbook created by the South Coast Air Quality Management District (the District). The District is the agency responsible for regulating nonvehicular air pollution in certain counties in southern California. (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 317 [106 Cal.Rptr.3d 502, 226 P.3d 985].) The District typically requires a health risk assessment of diesel particulate matter for projects that (1) generate substantial truck traffic (such as a warehouse distribution center or a truckstop), or (2) substantially increase truck traffic over existing levels.

The Air Quality Assessment concluded that the Project would not significantly impact traffic, and determined that emissions associated with construction and operation of the Project did not exceed any air quality significance thresholds. Thus, there was no need for the City to conduct a health risk assessment or screening. Citizens has not cited any evidence in the record to dispute these conclusions.

Finally, although a box in the initial study was marked to show that the impact of the Project with regard to exposing sensitive receptors to substantial pollutant concentrations would be "less than significant *with mitigation incorporated*" (italics added), it appears this box was marked in error as the Air Quality Assessment established that the Project would not exceed any air quality significance thresholds. Additionally, the mitigation measures specified in the MND do not relate to mitigating pollution for sensitive receptors; rather, they relate to best management practices to control dust and reduce air emissions during construction activities, and design features in the Project to reduce greenhouse gas emissions.

Accordingly, we conclude there is no substantial evidence of a fair argument that the Project may have a significant impact by exposing sensitive receptors to increased air pollution.

IV. *Cumulative Impact on Particulate Matter and Ozone*

■ The federal Clean Air Act (42 U.S.C. § 7401 et seq.) requires that the United States Environmental Protection Agency establish national air quality standards. (42 U.S.C. § 7409(a), (b).) Additionally, the State Air Resources Board established its own standards for California. (Health & Saf. Code, § 39606, subd. (a)(2).) Areas that do not meet national or state standards for a particular pollutant are considered to be nonattainment areas for that pollutant. (42 U.S.C. § 7407(d).)

Citizens notes that the Air Quality Assessment indicated that the region where the Project is located is in nonattainment of federal standards for eight-hour ozone and in nonattainment of state standards for ozone and particulate matter. Citizens concludes that the Project may have a significant cumulative air quality impact due to its contribution of particulate matter and NOx (nitrogen oxides, an ozone precursor) in a nonattainment area. The record does not support Citizens's assertion.

The Air Quality Assessment evaluated whether the Project would result in a cumulatively considerable increase of particulate matter, or exceed quantitative thresholds for ozone precursors. To determine whether the Project would cumulatively increase net particulate matter or exceed quantitative thresholds for ozone precursors for which the San Diego air basin is in nonattainment, the City evaluated Project emissions against the significance thresholds established by the District. (Guidelines, § 15064.7 [The lead agency may rely on a threshold of significance standard to determine whether a project will cause a significant environmental effect.].) For nonattainment pollutants, the Air Quality Assessment concluded that the Project could potentially result in "a cumulatively considerable net increase in these pollutants and thus could have a significant impact on the ambient air quality" if the emissions exceeded the screening level thresholds.

A table in the Air Quality Assessment shows the screening level criteria for impacting air quality. Other tables list the screening level criteria for various emissions during construction and operation of the Project, along with estimated emissions during construction and operation of the Project. These tables show that the net emissions *increases* over the existing amounts are below the significance level for all pollutants.

Although the Project will contribute additional air pollutants to an existing nonattainment area, these increases are below the significance criteria and are thus considered to have no significant impact on ambient air quality based on the standard articulated in the Air Quality Assessment. Citizens has not presented any evidence to contradict the conclusion in the Air Quality Assessment that these increases are below the significance criteria, nor does it assert that the Air Quality Assessment articulated an erroneous standard for determining whether the increases in nonattainment pollutants have a significant impact on ambient air quality. Thus, we conclude no fair argument exists that the Project will cause a significant unavoidable cumulative contribution to an air quality impact.

V.  *Cumulative Impact on Greenhouse Gas Emissions and
Climate Change*

The Air Quality Assessment shows that greenhouse gas emissions come from a variety of sources, including waste, and that waste generates 2 percent of total greenhouse gas emissions. Citizens argues that the Air Quality Assessment underestimated the Project's contribution to greenhouse gases because it failed to include waste as a greenhouse gas producer in its inventory. Citizens contends that because the store will be larger, it is reasonable to assume that it will generate more waste.

While the proposed Target store will be larger, Citizens's assumption that it will generate more waste is erroneous as the proposed store will maintain the existing dumpster, which will be emptied at the same frequency as the existing Target store. Thus, the increased store size is not projected to increase waste, or greenhouse gas emissions generated from waste. Moreover, Citizens's argument ignores that the Project eliminated two existing facilities that generated waste, a market and a smog check facility. Taking into account the elimination of these waste producers, it is more reasonable to assume that the Project will result in a net decrease of waste and resultant greenhouse gas emissions. Thus, under these facts, the City did not err when it failed to include waste as a source of greenhouse gas emissions.

Citizens observes that the Air Quality Assessment indicated that the first part of the threshold of significance for the Project's greenhouse gas emissions and climate change impacts was whether the Project would "[c]onflict with or obstruct the goals or strategies of the California Global Warming Solutions Act of 2006 (AB 32) or its governing regulation." As a preliminary matter, Citizens takes issue with the City's use of Assembly Bill No. 32 (2005–2006 Reg. Sess.) as the significance threshold. It asserts that the Project exceeds the significance thresholds under three other well-recognized potential thresholds of significance. As such, it contends that a fair argument exists that the Project will significantly impact greenhouse gas emissions and climate change.

Citizens does not contend, however, that there is one universally accepted significance threshold, and that the City erred by utilizing Assembly Bill No. 32 (2005–2006 Reg. Sess.). Rather, the Air Quality Assessment made clear that, while guidelines were being proposed, none existed at that time for determining the impact of a project on greenhouse gas emissions or climate change. Accordingly, the Air Quality Assessment noted that lead agencies may exercise their discretion on what criteria to use. (Guidelines, § 15064(b)

["The determination of whether a project may have a significant effect on the environment calls for careful judgment on the part of the public agency involved, based to the extent possible on scientific and factual data."].)

█ Effective March 18, 2010, the Guidelines were amended to address greenhouse gas emissions. (Guidelines, § 15064.4.) The amendment confirms that lead agencies retain the discretion to determine the significance of greenhouse gas emissions and should "make a good-faith effort, based to the extent possible on scientific and factual data, to describe, calculate or estimate the amount of greenhouse gas emissions resulting from a project." (Guidelines, § 15064.4(a).) When assessing the significance of impacts from greenhouse gas emissions on the environment the lead agency should consider the extent the project may increase or reduce greenhouse gas emissions; whether the project emissions exceed a threshold of significance that the lead agency determines applies to the project; and the extent the project complies with regulations or requirements adopted to implement a statewide, regional, or local plan for the reduction or mitigation of greenhouse gas emissions. (Guidelines, § 15064.4(b).) Thus, under the new guidelines, lead agencies are allowed to decide what threshold of significance it will apply to a project.

Here, the City properly exercised its discretion to utilize compliance with Assembly Bill No. 32 (2005–2006 Reg. Sess.) as the threshold. Accordingly, we reject Citizens's argument that the City erred by not applying a different threshold.

We also reject Citizens's argument that the standard and analysis used by the City were arbitrary and unsubstantiated. Assembly Bill No. 32 (2005–2006 Reg. Sess.) sets a target of reducing greenhouse gas emissions to 2000 levels by 2010 and 1990 levels by 2020. The Air Quality Assessment estimated that to reach 2000 levels by 2010 required 11 percent below business as usual emissions and to reach 1990 levels by 2020 required 25 percent below business as usual emissions. The Air Quality Assessment then established a target of 20 percent below business as usual as the appropriate standard, and not the 25 percent below business as usual that would be needed to be consistent with the estimate for reaching 1990 levels by 2020, stating that this is "an appropriate midpoint between the 2010 and 2020 targets set forth in AB 32 considering the timeframe for Project operations is within these dates."

Citizens contends that the City arbitrarily picked a number falling somewhere between the 2010 and 2020 targets, and that the standard selected was not supported by substantial evidence. Citizens is correct that the Air Quality Assessment established a target of 20 percent below business as usual as the appropriate standard, and not the 25 percent below business as usual that

would be needed to be consistent with Assembly Bill No. 32 (2005–2006 Reg. Sess.). However, the Air Quality Assessment ultimately concluded that, with implementation of emission reduction programs, the Project would reduce greenhouse gas emissions by 29 percent by 2020. This is 4 percent more than the Assembly Bill No. 32 (2005–2006 Reg. Sess.) goal of 25 percent. Thus, it is irrelevant whether the Air Quality Assessment utilized a 20 percent reduction or a 25 percent reduction as the target, because the 29 percent reduction exceeded both goals.

The record supports the 29 percent reduction. The Air Quality Assessment listed the operational emissions for "business as usual" for the existing Target store and the proposed store at 8,280 metric tons per year and 10,337 metric tons per year, respectively. Thus, under "business as usual" the proposed Target store would increase greenhouse gas emissions by 2,057 metric tons. However, through the implementation of energy saving measures, the operational greenhouse gas emissions for the proposed store are reduced to 7,381 metric tons per year, or 2,956 metric tons *less than* "business as usual." This amounts to a 29 percent reduction from business as usual.

Finally, Citizens argues that even assuming consistency with the goals of Assembly Bill No. 32 (2005–2006 Reg. Sess.) was the proper significance threshold and that the 29 percent reduction cited in the Air Quality Assessment is accurate, the Project does not achieve a 33 percent reduction below the business as usual threshold required for San Diego County as set forth in an "On-Road Transportation Report" (the Report) which is a component of the San Diego County Greenhouse Gas Inventory. As we explained above, the City had the discretion not to adopt this different threshold. Thus, we do not respond to Citizens's arguments premised on this different inventory. In any event, the Report acknowledged that Assembly Bill No. 32 does *not* require cities or counties to reduce emissions by a certain amount, and noted that the required reductions listed were "theoretical."

In summary, we conclude no fair argument exists that the Project will have a significant greenhouse gas emissions and climate change impact.

## DISPOSITION

The judgment denying appellant's petition for writ of mandate is reversed to the extent it concluded that appellant had not presented a fair argument that hazards and hazardous materials from the Project may create a potentially significant adverse environmental impact. In all other respects, the judgment is affirmed. On remand, the trial court shall determine whether the

corrective action plan addresses contaminated soil. In the event the trial court determines that the corrective plan does not address contaminated soil, it is to order an EIR. The parties are to bear their own appellate costs.

McDonald, Acting P. J., and Aaron, J., concurred.

A petition for a rehearing was denied August 5, 2011, and appellant's petition for review by the Supreme Court was denied October 19, 2011, S195612. Kennard, J., did not participate therein.