CHIN, J.,
Dissenting.—I respectfully dissent. I would affirm the judgment of the Court of Appeal. Its opinion, authored by Presiding Justice Turner, and joined by Justices Mosk and Kriegler, contains an extraordinarily thorough and careful review of the issues and reaches the correct result.
The majority decides three issues under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.).
Regarding the first issue, I agree with the majority that the lead agencies— the Department of Fish and Wildlife (DFW) and the United States Army Corps of Engineers—used a proper methodology in the environmental impact report (EIR) to determine whether the development would significantly impact the environment by its discharge of greenhouse gases. As the majority notes, CEQA is not a population control measure. (Maj. opn., ante, at p. 220.) If the development is not built, the 58,000 or so residents the planned community is intended to house, along with the necessary infrastructure and the proposed commercial enterprises, will be someplace else. Accordingly, the majority correctly rejects the project opponents’ argument that the only permissible method is to compare the development with no development. It makes eminent sense, and comes within the lead agencies’ discretion, to compare the proposed development’s greenhouse gas emissions with the emissions projected in a business-as-usual model to measure the emission *245 reduction needed to comply with legally established goals for greenhouse gas reductions. I disagree, however, with the majority’s conclusion that the EIR does not adequately explain why a projected 31 percent reduction in greenhouse gas emissions is consistent with legally mandated reduction goals.
Regarding the second issue, I disagree with the majority’s holding that the proposal to move the unarmored threespine stickleback fish out of harm’s way is a taking under the Fish and Game Code, and that, therefore, the EIR may not call the program a mitigation measure.
Regarding the third issue, compliance with the time requirements for making objections under CEQA is critically important so that litigation over an EIR does not become a never-ending battle of attrition with ever-changing targets for project opponents to aim for. However, under the very specific circumstances of this case, including the fact that the EIR fully addresses the objections, I agree with the majority that the Court of Appeal should not have found two of the objections forfeited. But because the Court of Appeal also rejected the arguments on the merits, convincingly showing that the EIR adequately considered the objections, the error provides no basis to reverse the judgment.
A. Preliminary Comments
“The Legislature has made clear that an EIR is ‘an informational document’ and that ‘[t]he purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.’ [Citations.]” (Laurel Heights Improvement Assn. v. Regents of University of California (1988) 47 Cal.3d 376, 391 [253 Cal.Rptr. 426, 764 P.2d 278].) “The EIR is also intended ‘to demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action.’ ” (Id. at p. 392, quoting No Oil, Inc. v. City of Los Angeles (1974) 13 Cal.3d 68, 86 [118 Cal.Rptr. 34, 529 P.2d 66].)
The EIR in this case is one of the longest ever prepared under CEQA— which is appropriate, given that the project is one of the largest ever proposed in California. It was prepared over a period of at least five years, with ample opportunity for public input. The EIR does just what it is supposed to do. It has fully informed those who are entrusted to make the decisions, as well as the general public, of the project’s environmental impacts. Now it is time finally to let the decision makers make decisions.
As the majority summarizes, “[t]o be developed over about 20 years on almost 12,000 acres along the Santa Clara River west of the City of Santa *246 Clarita, the proposed Newhall Ranch would consist of up to 20,885 dwelling units housing nearly 58,000 residents as well as commercial and business uses, schools, golf courses, parks and other community facilities.” (Maj. opn., ante, at pp. 213-214.)
After much community and regulatory input, the project also promises to be very “green,” with large reductions in the amount of greenhouse gas emissions to be expected. The developer, The Newhall Land and Farming Company, summarizes that, as documented in the EIR, the proposed development will reduce greenhouse gas emissions “by providing, for example, improved insulation and ducting, low E glass, high efficiency heating and air conditioning, and radiant barriers in attic spaces.” Additionally, it will rely on various other design features to reduce the emissions, including:
“(a) close proximity of homes to jobs and services;
“(b) public transit;
“(c) trails, paseos, and pathways for walking and biking;
“(d) tree planting and native and drought-tolerant landscaping;
“(e) energy efficient lighting;
“(1) use of solar water heating for all Newhall Ranch recreational center pools;
“(g) silver certification for the design and construction of Newhall Ranch fire stations and public library consistent with the ‘Leadership in Energy and Environmental Design’ . . . standards;
“(h) comprehensive recycling;
“(i) park-and-ride lot, bus stops, transit station, bus transfer station; and
“(j) reservation of right-of-way for a Metrolink fight rail line to facilitate residents relying less on vehicle travel.”
Neither the majority nor the project opponents dispute this summary.
The Newhall Ranch project has been thoroughly reviewed over a period of many years, resulting in an extraordinarily thorough EIR. (The portion concerning greenhouse gas emissions alone is hundreds of pages long.) After *247 earlier litigation delayed the proposed project for several years, work on the current EIR began around 2005. After some five years of work, public comment, and revisions, the final EIR was certified in 2010. As the amicus curiae brief supporting the project filed by former Governors George Deukmejian, Pete Wilson, and Gray Davis notes, at different times and during different steps in the review process, eight different governmental agencies, representing every level of government, federal, state, and local, have studied, imposed conditions on, and, ultimately, approved the project: (1) the DFW, (2) the United States Army Corps of Engineers, (3) the United States Environmental Protection Agency, (4) the United States Fish and Wildlife Service, (5) the Los Angeles Regional Water Quality Control Board, (6) the Los Angeles County Local Agency Formation Commission, (7) the Los Angeles County Board of Supervisors, and (8) the Los Angeles County Regional Planning Commission.
Each of these agencies has far greater expertise than this court in judging the merits of the proposal and determining what mitigation measures are appropriate and what conditions to impose. They also are responsible for planning and managing California’s inevitable future population growth. Now project opponents have turned to the courts in their final effort to invalidate the 2010 EIR and derail the project, culminating in this action. This court should be cautious about overturning the considered judgment of these eight agencies. California’s environmental laws are not intended to prevent development that is needed to accommodate the state’s growing population. Instead they are designed to encourage planned development by ensuring that decisions regarding how to accommodate the state’s growing population while protecting the environment are informed. The instant project is very thoroughly planned, and the detailed and careful EIR has fully informed the decision makers.
The majority finds two flaws in the EIR, which I discuss in order.
B. Greenhouse Gas Emissions
California has mandated substantial future reductions in greenhouse gas emissions. The mandate is critically important to our environment and must be treated very seriously. The EIR and the reviewing agencies had to consider very carefully the project’s emission impact. And they did just that. As the EIR explains, the project, with the proposed mitigation measures, will result in a 31 percent reduction in greenhouse gas emissions from a business-as-usual model. The EIR fully explains this calculation. Neither the majority nor *248 the project opponents dispute it. Indeed, the Court of Appeal opinion explains that evidence exists that this figure is actually “conservative.”
The EIR also compares the 31 percent reduction to the reduction goal the Legislature established under the California Global Warming Solutions Act of 2006 (Health & Saf. Code, § 38500 et seq.), commonly known as Assembly Bill No. 32 (2005-2006 Reg. Sess.) (Assembly Bill 32). As the majority explains, the EIR’s method was modeled on the State Air Resources Board’s determination that the reduction goal under Assembly Bill 32 is 29 percent from business as usual. (Maj. opn., ante, at p. 218.) It appears the lead agencies could have, in their discretion, used an even lower goal as its measurement. According to an analysis of the scoping plan conducted by the Bay Area Air Quality Management District (BAAQMD), “ ‘land use-driven’ sectors” will be expected to demonstrate only a 26.2 percent reduction in greenhouse gas emissions. (BAAQMD, California Environmental Quality Act Guidelines Update: Proposed Thresholds of Significance (May 3, 2010) pp. 12-13, 15.) But because the EIR used the higher goal of a 29 percent reduction, I will also.
Three recent Court of Appeal opinions have made clear that comparing the proposed reduction with Assembly Bill 32’s reduction goal is a proper methodology within the agencies’ discretion. (Friends of Oroville v. City of Oroville (2013) 219 Cal.App.4th 832, 841 [164 Cal.Rptr.3d 1] [“The City properly adopted Assembly Bill 32’s reduction targets for [greenhouse gas] emissions as the threshold-of-significance standard in determining whether the Project’s [greenhouse gas] emissions constituted a significant environmental impact.”]; North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors (2013) 216 Cal.App.4th 614, 652 [157 Cal.Rptr.3d 240] [“[T]he EIR concluded the Project would not interfere with achieving a 15 percent reduction in countywide [greenhouse gas] emissions, compared to 1990 levels, by 2020. This analysis more than satisfied the requirements of CEQA.”]; Citizens for Responsible Equitable Environmental Development v. City of Chula Vista (2011) 197 Cal.App.4th 327, 336 [127 Cal.Rptr.3d 435] [“Here, the City properly exercised its discretion to utilize compliance with Assembly Bill No. 32 (2005-2006 Reg. Sess.) as the threshold.”]; see Citizens for Responsible Equitable Environmental Development, at p. 337 [a reduction of greenhouse gas emissions 4 percentage points greater than Assem. Bill 32’s goal was sufficient].)
Here, the reduction was 2 percentage points greater than the established goal, rather than the 4 percentage points found adequate in Citizens for *249 Responsible Equitable Environmental Development v. City of Chula Vista, supra, 197 Cal.App.4th 327. But the holding in that case did not turn on the exact amount the reduction exceeded the goal. The agencies did not abuse their discretion in adopting a methodology that three Courts of Appeal have approved.
Contrary to this authority, the majority holds that the EIR does not adequately explain how a 31 percent reduction in greenhouse gas emissions is consistent with Assembly Bill 32’s goal of a 29 percent reduction. Citing a letter from the California Attorney General’s Office, it suggests that a new development should exceed that goal by some amount—presumably an amount greater than 2 percentage points. (Maj. opn., ante, at p. 226.) For example, one expert group has proposed, as one possibility, a criterion of 50 percent reduction for new developments. (Cal. Air Pollution Control Officers Assn., CEQA & Climate Change: Evaluating and Addressing Greenhouse Gas Emissions from Projects Subject to the California Environmental Quality Act (Jan. 2008) p. 33.) A 50 percent reduction would be impressive and certainly would be wonderful. But what might be ideal does not have the force of law. If the Legislature had enacted a statute requiring new developments to exceed the goal by a specified amount—or perhaps if an authoritative governmental agency charged with implementing the legislation had so specified—then we should enforce it. But the Attorney General’s letter and the project opponents’ arguments are not legally binding.
Indeed, recognizing that a 50 percent reduction is not legally required, the same expert group suggested other possibilities. As a recent law review article explains, that group also stated that a possible approach would be to conclude that “an individual project that has greenhouse gas emissions that are 28-33 % less than such a project would otherwise have under a [business-as-usual] scenario could be considered less than significant for purposes of CEQA.” (Crockett, Addressing the Significance of Greenhouse Gas Emissions Under CEQA: California’s Search for Regulatory Certainty in an Uncertain World (2011) 4 Golden Gate U. Envtl. L.J. 203, 215-216.) Additionally, as Justice Corrigan explains, the majority’s criticism of the EIR for failing to correlate its population density comparison with the business-as-usual comparison used in the Scoping Plan is unduly hypertechnical and inconsistent with our deferential substantial evidence review. (Cone. & dis. opn., ante, at p. 243, citing maj. opn., ante, at p. 221.) Given the absence of any expert or regulatory consensus regarding the best methodology, the lead agencies acted within their discretion in adopting their chosen methodology. The EIR fully explains that the proposed reduction in greenhouse gas emissions is greater than Assembly Bill 32’s goal. No legal basis exists to *250 determine that this is insufficient. Accordingly, the agencies acted within their discretion in finding that exceeding the targeted reduction would not significantly interfere with meeting the targeted reduction.
I would also find no prejudice. Only so much can be expected of an EIR. The EIR informed the decision makers and general public exactly what the project’s likely impacts would be. More is not required. (See Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection (2008) 44 Cal.4th 459, 485 [80 Cal.Rptr.3d 28, 187 P.3d 888].)
C. The Unarmored Threespine Stickleback
To the extent the proposed project threatens harm to the unarmored threespine stickleback fish (stickleback), the EIR describes mitigation measures that will be taken to protect it. Briefly stated, the project managers have developed a program whereby United States Fish and Wildlife Service employees and their agents (and only those personnel) will move the stickleback out of harm’s way as necessary to protect them. No one seems to challenge this program’s efficacy in protecting and preserving the species. But the majority interprets the Fish and Game Code as prohibiting the EIR from calling the program a mitigation measure.
I note, first, that the majority’s holding has little substance. The majority makes clear that the United States Fish and Wildlife Service is allowed to protect the stickleback in this way. (Maj. opn., ante, at pp. 232, 234.) The majority is clearly correct in this regard. The Fish and Game Code does not prohibit this federal agency from protecting the stickleback. (See Biological Diversity v. United States Fish, Wildlife (9th Cir. 2006) 450 F.3d 930, 941-943.) All that the majority prohibits is referring to the program as a binding mitigation measure in the EIR. Because the EIR’s purpose is to provide “ ‘detailed information about the effect which a proposed project is likely to have on the environment’ ” (Laurel Heights Improvement Assn. v. Regents of University of California, supra, 47 Cal.4th at p. 391, italics added), even the majority permits the EIR to discuss the program as a way to avoid harm to the stickleback. All the majority presumably requires the EIR’s drafters to do is to use a phrase such as “avoid harm” or “protect the species,” and not use a word like “mitigate.”
The majority is also wrong as a matter of statutory interpretation. The stickleback is officially designated as both an “endangered species” and a “fully protected fish.” (Fish & G. Code, §§ 2062, 5515, subd. (b)(9); all further statutory citations are to this code.) “The Legislature . . . finds and *251 declares that it is the policy of this state to conserve, protect, restore, and enhance any endangered species or any threatened species and its habitat and that it is the intent of the Legislature, consistent with conserving the species, to acquire lands for habitat for these species.” (§ 2052.) Section 2061 defines “ ‘[cjonserve’ ” as using methods necessary to make the species no longer endangered, including ‘'live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.” (Italics added.) Between them, sections 2052 and 2061 permit, and indeed encourage, the program here, whereby the federal agency moves an endangered species like the stickleback out of harm’s way.
But the majority concludes that a provision concerning fully protected fish prohibits as a mitigating measure what the statutes concerning endangered species encourage. ‘“[Fjully protected fish or parts thereof may not be taken or possessed at any time.” (§ 5515, subd. (a)(1).) The section excepts takings “for necessary scientific research,” but the exception does not include actions taken to mitigate a project. (Id., subd. (a)(1), (2).) The question before us, therefore, is whether moving the stickleback out of harm’s way would be a prohibited taking. The majority concludes it is. The DFW and I disagree.
“ ‘Take’ means hunt, pursue, catch, capture, or kill, or attempt to hunt, pursue, catch, capture, or kill.” (§ 86.) Viewed in isolation, it is plausible (but far from compelled) to conclude that the program at issue does involve a taking within this definition. However, “[w]e do not examine [statutory] language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment.” (Coalition of Concerned Communities, Inc. v. City of Los Angeles (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563].)
Section 86’s definition of “take” applies to the entire Fish and Game Code, including section 2061, and not just to section 5515. (See § 2.) Section 2061 refers separately to “live trapping,” “transplantation,” and “taking,” which is permitted in an extraordinary case. These separate references, and the special rule for taking, necessarily imply that “taking” is different than “live trapping” and “transplantation.” The majority does not explain what the difference is between “taking” and “live trapping” or “transplantation,” or why the program constitutes taking rather than live trapping or transplantation, as the DFW argues.
Viewed in light of section 2061, the DFW is correct that the planned movement is not a taking within the meaning of the code. Any reasonable interpretation of that word is that it has some connotation of harm to the *252 species, although not necessarily mortal harm. Obtaining possession of the fish just long enough to move them from a place of danger to a place of safety, then letting them go, is not a taking; it is live trapping and transplantation.
The statutory scheme provides other clues that this is the correct interpretation. Section 2061 permits “regulated taking” as a method to conserve an endangered species in “the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved.” What this means is that if excessive population is itself threatening the species—perhaps due to insufficient resources to sustain the population—and the population excess cannot otherwise be relieved, the agency may employ regulated taking. This kind of taking must refer to a permanent taking that will reduce the population pressure, not merely a temporary movement of the fish from a place of danger to a place of safety. Section 5515 precludes such a regulated taking when used merely to mitigate the effects of a project, for example, when the project itself would reduce the resources and thus would itself cause the population pressure. All this would make sense. Contrary to the majority’s argument, my interpretation would give full effect to section 5515, subdivision (a). (See maj. opn., ante, at p. 233.) But nothing in section 5515 precludes the DFW’s interpretation of the proposed program as live trapping and transplantation, rather than a taking.
This interpretation harmonizes the entire statutory scheme, and does not make the scheme contain contradictory mandates—one mandate for endangered species and another mandate for fully protected fish. It is the interpretation the DFW—the agency charged with administering the law regarding endangered and fully protected species—has given it. We are not bound by the agency’s interpretation if it is obviously wrong, but we should at least give it deference. The DFW is far more expert in conserving endangered and fully protected fish than we are. It is not obviously wrong for that agency to view the program as live trapping and transplantation rather than taking.
The majority cites section 3511 as somehow suggesting that “live capture and relocation” (a concept essentially the same as the live trapping and transplantation cited in § 2061) is either the same as taking or a subset of taking. (Maj. opn., ante, at p. 236.) The section contains no such suggestion. It states that “fully protected birds or parts thereof may not be taken or possessed at any time,” but the DFW “may authorize the live capture and relocation of those species pursuant to a permit for the protection of livestock.” This language prohibits taking but permits, in some circumstances, live capture and relocation, thus suggesting that the concepts are separate, not the same.
*253 The majority’s reference to “[hjunting and killing animals” (maj. opn., ante, at p. 235) is puzzling. Moving an endangered and fully protected species from a place of danger to a place of safety bears no resemblance to hunting and killing. Hunting and killing can readily be viewed as a taking, not live trapping and transplantation. But doing so does not compel the conclusion that moving a species to a place of safety is also a taking rather than live trapping and transplantation.
The majority invokes the specter of self-help by self-appointed amateur conservationists. (Maj. opn., ante, at p. 235.) Interpreting the program to be a permitted live trapping and transplantation rather than a prohibited taking has nothing to do with self-help. The DFW and the United States Fish and Wildlife Service are not self-appointed experts, but governmental agencies mandated to protect and conserve endangered and protected species. I agree with the majority that the Legislature did not intend to ‘“allow unauthorized persons found pursuing and catching a protected species to assert as a complete defense that their intent was not to harm the animal but to restore or transplant it to a safe habitat.” {Ibid.) The Fish and Game Code does not allow unauthorized persons to so act. Indeed, because the special rule concerning taking applies to fully protected fish only and not more generally to endangered species, the majority’s analysis would mean that ‘“unauthorized persons found pursuing and catching” an endangered species could ‘“assert as a complete defense that their intent was not to harm the animal but to restore or transplant it to a safe habitat.” The Legislature cannot have intended that either.
In short, to protect the stickleback as needed, the United States Fish and Wildlife Service can implement the program of the live trapping and transplantation of the fish from a place of danger to a place of safety. And, in describing the program, the EIR can call it a ‘“mitigation measure” without violating the Fish and Game Code.
D. Conclusion
We have ‘“caution[ed] that rules regulating the protection of the environment must not be subverted into an instrument for the oppression and delay of social, economic, or recreational development and advancement.” (Citizens of Goleta Valley v. Board of Supervisors (1990) 52 Cal.3d 553, 576 [276 Cal.Rptr. 410, 801 P.2d 1161].) Today’s opinion threatens this very subversion.
The Newhall Ranch project has been very long in planning, approval, and litigation. The current EIR was finalized some five years ago. The two flaws the majority has found in the EIR can easily be fixed. (See maj. opn., ante, at *254 pp. 228-231 [describing how the supposed error in finding that a 31 percent reduction in greenhouse gas emissions would not significantly interfere with meeting a targeted reduction of 29 percent can be fixed].) As noted, regarding the program to protect the stickleback, the lead agencies seemingly need only delete from the EIR any terms that sound like “mitigation” and use instead some other term such as “avoiding harm” or “protecting the species.” So, in one sense, one might ask what is the harm in sending the case back to fix these flaws.
The harm is in delay. This litigation has already delayed implementing the EIR some five years or so. Now this court is sending the case back to the Court of Appeal. Among other things, it is permitting the project opponents to relitigate some already decided issues even though the Court of Appeal fully rejected the arguments the first time. It also leaves it to the Court of Appeal, or perhaps to the superior court on a further remand, to decide the exact parameters of the writ of mandate to be issued. (Maj. opn., ante, at p. 240.) At some point, this appeal will end, and the writ will issue. At some point after that, the EIR will have to be revised, with the necessary period of public comment, etc. (although presumably limited to the two flaws the majority has found). Then it is predictable that yet more litigation will follow the finalization of the new EIR. Given the glacial pace of litigation, this will easily take years.
And it gets worse. The majority strongly hints that the time will come when compliance with goals established for the year 2020 will not be sufficient, and the proposed project will have to meet some different goals established for the future beyond 2020. (Maj. opn., ante, at p. 223.) By the time this litigation ends, and the new EIR is prepared and finalized, we will be much closer to 2020 than when the current EIR was finalized in 2010. Delay can become its own reward for project opponents. Delay the project long enough and it has to meet new targets, and then perhaps new targets after that. All this is a recipe for paralysis. But CEQA is not meant to cause paralysis. Carefully planned green communities are needed to accommodate California’s growing population. CEQA ensures the informed planning, but it does not prohibit the planned communities.
CEQA does nothing to control California’s population growth. The 58,000 or so people the proposed project is intended to accommodate will not just go away. They will be living and working somewhere. And that somewhere will undoubtedly be far less green than this project promises to be. The longer the project is delayed, the longer the workplaces and residences of 58,000 people *255 will be emitting business-as-usual amounts of greenhouse gases, rather than the greatly reduced amount projected under this project. Today’s opinion will delay the project even longer.
I would affirm the judgment of the Court of Appeal and put an end to this litigation.
The petition of respondents and real party in interest for a rehearing was denied February 17, 2016, and the opinion was modified to read as printed above.